**Russell Irwin BARNHART, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–85–01038–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 28, 1986.

Ken J. McLean, Houston, for appellant.

John B. Holmes, Jr., Harris Co. Dist. Atty., Winston E. Cochran, Jr., Marie Munier, Harris Co. Asst. Dist. Attys., Houston, for appellee.

Before DUGGAN, LEVY and HOYT, JJ.

## OPINION

LEVY, Justice.

This is an appeal from a conviction for sexual assault of a child in which the jury assessed punishment at 12 years confinement.[1]

Viewed in the light most favorable to the prosecution, the evidence reflects that complainant was a 14–year-old mentally retarded girl who lived with her mother. Complainant's mother became friends with appellant and his wife while all were living at the Harrisburg Hotel in Harris County, where appellant's wife was manager. Appellant was a sea cook who, during periods of unemployment, also took on odd jobs in his workshop on the premises. The couple often cared for complainant for a few hours or overnight in order to allow her mother, who suffered from heart trouble, some rest. The relationship continued after complainant and her mother moved to another residence.

In the first part of April, 1985, complainant's mother arranged to go to Maryland to assist her recently widowed older daughter and grandchildren. Complainant was nearing the end of her menstrual cycle when she was left with appellant and his wife. Complainant's mother returned about nine days later and resumed custody of the complainant.

A few weeks later, complainant began suffering nausea and vomiting. When her mother took her to the doctor, she was determined to be pregnant. At some unspecified point, complainant also began ex-

---

1. Section 22.011(a)(2)(A) of our Penal Code does not require the State to prove that the sexual penetration was accomplished by force or was without the child's consent. It defines sexual assault as follows:

A person commits an offense if the person ... intentionally or knowingly causes the penetration of the anus or vagina of a child by any means....

hibiting unusual behavior, consistent with a child reliving a traumatic event.

Complainant was referred to welfare counselors associated with Ben Taub Hospital, and the police were notified. Complainant was then taken to an obstetrician-gynecologist, who terminated the pregnancy. Maternal and fetal blood samples and fetal tissue samples were collected.

Blood samples were also taken from appellant pursuant to a warrant. Paternity testing on all samples was performed independently by the serology section of the City of Houston Police Crime Laboratory and the Methodist Hospital Laboratory. The results of the police laboratory testing indicated that approximately only 20 to 40 men in the entire City of Houston could have had the same genetic profiles for paternity purposes, that the statistical probability of excluding an unknown man was "upwards of 99 percent," and that the 20 tests performed failed to exclude appellant. The results of the Methodist Hospital tests estimated the statistical probability of excluding an unknown man, with equal access to the complainant, at 99.4 percent. Hypothetically, if access were limited, the statistical probability of exclusion would be adjusted to near 99.9 percent. The tests failed to exclude the appellant.

The evidence further reflects that conception was estimated to have occurred in the beginning part of April, roughly coinciding with the testimony regarding fertility cycles, and the period during which complainant stayed with appellant and his wife. Testimony also indicated that no other men had access to complainant. Appellant was seen alone with the complainant leaving the Harrisburg Hotel in his van, and not returning for at least a few hours during the period in question.

At trial, the court held a hearing outside the presence of the jury to determine the competency of the complainant to testify. The complainant's answers to the court's questions were often unintelligible, unresponsive, or difficult to comprehend. The trial court declared her incompetent to testify.

By the first ground of error, appellant asserts that the trial court erred in admitting hearsay testimony by complainant's mother regarding complainant's unusual behavior and accompanying statements.

The testimony is transcribed as follows:
[BY THE PROSECUTOR:]

Q: Okay. Fine. Did you notice, other than the physical things, did you notice any behavior that was different?

A: Yes, there was several things that was different.

Q: Okay. Did you ever see her doing anything that was strange?

A: Yes, I did.

Q: Okay, Talking about one instance now, what did you see that was different?

A: One was her holding her hands back behind her head.

A: Okay. Now, did you go into—was this in V_____'s room?

Q: That was in V_____'s room.

A: Okay. Did you go into the room?

Q: Yes, I did.

A: Did you see V_____?

A: I seen V_____.

Q: Where was V_____?

A: Laying on the floor.

Q: Did she have on clothes?

A: She had on clothes.

Q: Okay. Do you recall what she had on?

A: Sometimes her gown, she would run around in her gown for awhile. Sometimes, this would be in the morning.

Q: Was she standing up or sitting down?

A: Laying down on the floor.

Q: What was it about that was unusual?

A: Can I explain it?

Q: How, what was she doing on the floor?

A: She was laying there with her hands, on one occasion, with her hands behind her back.

Q: Like what?

A: Like this, behind her back, and I asked her what she was doing, and she said she was tied up.

Q: Was she saying anything that made you go into the room and look?

A: Yes, she was screaming in there, and crying, screaming loud.

Q: Could you understand what she was saying?

A: Yes.

Q: What was she saying?

A: She was screaming, "No. Don't. You are hurting me." She was screaming it over and over, real loud.

Q: Before you left her at the beginning of April, 1985, had she ever done anything like that before that you know of?

A: No, she never had.

Q: Did you ask her what she was doing?

A: Yes, I did.

Q: Did she tell you?

A: Yes.

Q: What did she tell you?

A: That Russ had her tied up. Is it all right to say that?

Q: What did she tell you?

A: That Russ had her tied up. He tied her arms behind her back.

[DEFENSE COUNSEL]: I object to this as being hearsay.

THE COURT: That will be overruled.

[DEFENSE COUNSEL]: Please note our exception.

THE COURT: Yes, sir.

Q: Did she tell you anything else?

A: Yes, that he had got—

Q: At that time, when she was laid down on the floor.

A: Yes.

Q: What did she say?

A: There were rags in her mouth and tape on her mouth.

[DEFENSE COUNSEL]: Your Honor, may I have a continuing objection?

THE COURT: Yes, sir, you may.

Q: What else did she tell you?

A: About the rags being in her mouth and tape on her mouth.

Q: Did she say who did that?

A: She said Russ done that.

Q: Did she tell you anything else about that?

A: She told me that Russ got on top of her and put his teetee in her teetee. That is what my daughter calls it. And that he hurt her very bad.

Q: When she was saying that, what was her demeanor, or what was she doing when she was talking to you?

A: She was crying all the time when she tells me this, and screaming, and she was telling me she was hurt, that he was hurting her.

Q: When you found out your daughter was pregnant, did you ask her what happened?

A: Yes, I did.

Q: And where was the place where you asked her what happened?

A: I asked her at the doctor's office, but she wouldn't tell me then. She told me later when we went home, when we got home.

Q: When you asked her what happened, why was she pregnant, did she tell you?

A: Yes, she said it wasn't her fault. She said, "Not my fault, Wuss do it. Wuss do it."

Q: Wuss?

A: Wuss is Russ Barnhart.

Q: Does your daughter have difficulty sometimes communicating and forming her words?

A: She does. It is a little hard sometimes for some people to understand her. I can understand her.

Q: Now, does she know any other Russ, other than Russell Barnhart?

A: No, she doesn't.

Q: Did you go into her room on another occasion and find her doing something that was unusual?

A: Yes. Another time I walked in, and her skirt was pulled way up and she was laying there screaming and crying, "No, don't. You are hurting me. You are hurting me," and screaming.

Q: What was she doing with her arms or her hands at the time?

A: She said they were tied. She was like this another time with her hands tied down.

Q: Did you ask her about what she was doing then?

A: She said that Russ had tied her, she said with a rope.

Q: Was there another time, or any other time you went in and saw V_____?

A: Yes, another occasion she was holding her hand over her mouth like that, going, "Oh. Oh." Screaming as loud as she could. Something was on her mouth. She said that tape was on her mouth and rags in her mouth.

Q: Did you ask your daughter if anyone else had ever touched her?

A: Yes, I did.

THE COURT: Okay, let me see the attorneys up here, please. (Whereupon the following was said up at bench:)

THE COURT: We have covered the outcry.

[PROSECUTOR]: Okay.

THE COURT: Don't go into any more hearsay. Stay away from that now.

[PROSECUTOR]: Okay.

■ Appellant regards this testimony as "outcry," admissible only when Tex.Code Crim.P.Ann. art. 38.07 (Vernon Supp.1986) [2] applies. Under this article, a victim of a sexual offense must generally make an "outcry" within six months after the offense occurred for her uncorroborated testimony to support a conviction. He correctly contends that article 38.07 is inapplicable in the instant case because the complainant did not testify.[3] We observe that article 38.07 is inapplicable also because the complainant's testimony was corroborated by her pregnancy, access testimony, and genetic testing.

Moreover, appellant asserts that, although the record does not make it clear how long after the event the outcry was made, the statements were sufficiently remote from the event to preclude application of the *res gestae* or "spontaneous utterance" exception to the hearsay rule. Finally, appellant concedes:

the well settled evidentiary proposition that statements constituting a rape victim's complaint—also called "outcry"— are admissible in the State's case in chief as direct evidence of that complaint and this is so *without regard to the spontaneity thereof.*

*King v. State,* 631 S.W.2d 486, 491 (Tex. Crim.App.1982); *cert. denied,* 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982) (en banc, emphasis added). However, appellant contends that the cases applying the rule do not in fact do so without regard to spontaneity.

In *King,* the objection was to hearsay bolstering a witness's testimony. *Id.* at 492, n. 15. The holding suggests that a rape victim's "outcry" is a specially admissible form of hearsay which exists indepen-

---

**2.** Tex.Code Crim.P.Ann. art. 38.07 (Vernon Supp.1986) provides:

A conviction under Chapter 21, Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred. The requirement that the victim inform another person of an alleged offense does not apply if the victim was younger than 14 years of age at the time of the alleged offense. The court shall instruct the jury that the time which lapsed between the alleged offense and the time it was reported shall be considered by the jury only for the purpose of assessing the weight to be given to the testimony of the victim.

**3.** It is possible that the testimony was admitted in partial reliance on 38.07. Some likelihood of the complainant's incompetence to testify must have been understood by all herein, because the competency hearing was held without record indication of a request or motion for such a determination. The judicial declaration of incompetence rendered 38.07 inapplicable in the trial.

dently of *res gestae* or spontaneous exclamations. *See id.* at 491–92. *King* held the statements there at issue admissible to establish outcry, "if not as spontaneous exclamations as well." *Id.* at 493. The rule is clearly stated that outcry is admissible without regard to spontaneity; thus, less than six months remoteness from the event is irrelevant to admissibility. *King* did not rely on article 38.07. The offense was capital murder of one victim while in the course of committing aggravated rape of another. Article 38.07 addresses convictions for sexual offenses only.

■ We conclude that remoteness (i.e., less than six months) does not preclude the admissibility of a rape victim's "outcry" testimony, even where article 38.07 is inapplicable. *See and compare, e.g., Vera v. State,* 709 S.W.2d 681 (Tex.App.—San Antonio 1986, no pet.); *Heckathorne v. State,* 697 S.W.2d 8 (Tex.App.—Houston [14th Dist.] 1985, no pet.); *Giesen v. State,* 688 S.W.2d 176 (Tex.App.—Dallas 1985, no pet.); *Perez v. State,* 652 S.W.2d 581 (Tex. App.—Houston [1st Dist.] 1983, no pet.); *Brown v. State,* 649 S.W.2d 160 (Tex.App. —Austin 1983, no pet.).

■ Here, the circumstances under which the retarded complainant's statements were made, i.e., acting out the event, constitute some indicia of the reliability required in hearsay exceptions. In *Penry v. State,* 691 S.W.2d 636 (Tex.Crim.App. 1985), *cert. denied,* —— U.S. ——, 106 U.S. 834, 88 L.Ed.2d 805 (1986), a conviction for capital murder in the course of committing aggravated rape, the statement by the deceased that she had been stabbed and raped was held admissible as *res gestae.* The Court stated:

> As we said in the recent case of [*King* ] "[I]t is a well recognized exception to the general prohibition against hearsay evidence, that statements made while in the grip of violent emotion, excitement or pain, and which relate to the exciting event, are admissible under the rationale that the capacity for reflection necessary to the fabrication of a falsehood is lost." Further, "Such state-

ments may be admissible even [when made in response to an inquiry or] after an appreciable time has elapsed between the infliction of the injury and the making of the statement." *Martinez v. State,* 533 S.W.2d 20, 23 (Tex.Cr.App. 1976).

*Id.* at 647 (omitted portion supplied). The Court observed that even had it not been " 'true res gestae' it would have been allowed in under the 'outcry' theory." *Id.*

Although we agree that article 38.07 does not apply to the instant case, its rationale provides analytical support. The statute contemplates admission of testimony that "[t]he victim informed any person ... of the alleged offense within six months after the date on which the offense is alleged to have occurred." Lack of spontaneity is not a bar to admissibility, but the subject of an instruction "that the time which lapsed between the offense and the time it was reported shall be considered by the jury only for the purpose of assessing the weight to be given to the testimony of the victim."

The first ground of error is overruled.

By the second ground of error, appellant contends that the evidence is insufficient to sustain the conviction.

■ The standard of appellate review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ We find that the evidence is sufficient to sustain appellant's conviction. To recapitulate the evidence favorable to the prosecution, the complainant was 14 years old and was not pregnant before being left with appellant and his wife. She was later diagnosed as pregnant. Estimates of conception are roughly consistent with the date on or about which the offense was alleged to have occurred and consistent with the period during which she stayed

with the couple. Testimony eliminated any method of impregnation other than penetration of complainant's vagina. Despite appellant's considerable argument regarding genetics and paternity-testing evidence, the test results constituted some evidence that there was an extremely high probability that appellant's paternity of the fetus could have been, but was not, excluded. There was testimony that appellant was alone with and had access to complainant during the period in question. Finally, there was also testimony that no other men had access to her. These facts, in combination, are sufficient to support appellant's conviction beyond a reasonable doubt.

The second ground of error is overruled, and the judgment of the trial court is affirmed.