Gary Fitzgerald **REAGOR**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–90–01283–CR.

Court of Appeals of Texas, Dallas.

Aug. 14, 1991.

Discretionary Review Refused Nov. 20, 1991.

**482**

D. Robert Smith, Dallas, for appellant.

Pamela Sullivan Berdanier, Dallas, for appellee.

Before BAKER, LAGARDE and MALONEY, JJ.

## OPINION

MALONEY, Justice.

The jury convicted Gary Fitzgerald Reagor of aggravated sexual assault. The trial court assessed a thirty year sentence. In a single point of error, appellant contends that the evidence is insufficient to support the verdict. We sustain appellant's point and reverse the trial court's judgment.

### FACTUAL BACKGROUND

Complainant was three years old at the time in question. She lived in Dallas County with her parents and her five-year-old brother. Complainant shared a bedroom with her brother. On June 26, 1989, appellant, complainant's maternal uncle, spent the night at her house. He slept on the floor in the children's room. Three to seven days later, complainant's mother noticed some discharge in complainant's underwear. The discharge did not clear up. Complainant's parents took her to Parkland Hospital for treatment on July 19, 1989.

On July 27, 1989, a social worker told complainant's parents their daughter had gonorrhea. The social worker said that all men who had contact with complainant needed to be tested for venereal disease. Complainant's mother testified that complainant's father, grandfather, paternal uncle, and maternal uncle were the only men who had access to complainant. The next day, those men were tested for gonorrhea at the public health clinic.

The record also reveals that other men had access to complainant. Complainant's mother testified that complainant was sometimes, ("not too often"), around her uncle, George, and her fourteen-year-old cousin, Curtis. Complainant's mother further testified that there were teenage boys in that neighborhood. None of those individuals were tested.

As the men left the clinic, appellant told complainant's father that he tested positive for something, but it wasn't a venereal disease. The next day complainant's father called the clinic. He learned that only appellant tested positive for gonorrhea.

Complainant's parents testified about a previous incident which they now believe was suspicious. Complainant's father testified that appellant baby-sat with complainant when she was about two years old. The father once found a white, dried substance on the sheets. He thought it looked like sperm. He also testified that "she was kind of open in that area, so to speak."

Complainant's mother testified about what was apparently the same incident. However, she said that complainant was one year old. The mother testified that complainant looked "funny down there," "red down there," "widening or open," and "it looked wet." She thought appellant was not changing complainant's diapers often enough. The parents' only response to this incident was to tell appellant to change complainant's diapers more often.

At trial, the pediatrician who diagnosed complainant's gonorrhea testified that usually a female child contracts gonorrhea when a male touches the tip of his infected penis against the child's vagina. It may be "unusual," but it is "not impossible" that somebody could transmit gonorrhea from his hand provided that there was a "good dose of gonorrhea germs" on it. To become infected, complainant must have come in contact with something that had gonorrhea germs on it.

According to the doctor, the incubation period for gonorrhea is much shorter for males than females. In young females, the time lapse from contact with the germs to discharge could range from one day to four weeks.

The record also includes the testimony of a nurse from the public health clinic. She verified the men's test results. Appellant and complainant both had Neisseria gonorrhea. Before taking the test, appellant told the nurse that he had no symptoms of a veneral disease. He also told her that he had two female sexual partners. The nurse testified that gonorrhea could only be transmitted by penile to vaginal contact. According to the nurse, most people who contract gonorrhea develop symptoms between two and fourteen days from exposure. Finally, the nurse testified that gonorrhea is an "extremely common" disease. "Thousands" of people in Dallas County have gonorrhea.

## SUFFICIENCY OF THE EVIDENCE

■ Appellant contends the evidence is insufficient to support his conviction. He argues that the evidence only establishes that: (1) he and complainant had Neisseria Gonorrhea in the summer of 1989; and (2) he had an opportunity for sexual contact with complainant consistent with the incubation period. He maintains that there is no evidence that connects him to the offense. We agree.

### a. Standard of Review

■ When an appellant questions the sufficiency of evidence, we review the evidence in the light most favorable to the verdict. We determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State*, 769 S.W.2d 234, 239 (Tex.Crim.App.1989). This standard of review applies to circumstantial evidence cases as well as to direct evidence cases. *Houston v. State*, 663 S.W.2d 455, 456 (Tex.Crim.App.1984).

■ Texas law requires that the State establish: (1) the offense was actually committed; and (2) the accused was the person who either committed or participated in the crime. *See Johnson v. State*, 673 S.W.2d 190, 197 (Tex.Crim.App.1984). The State must prove more than just a plausible explanation of the crime. *Reeves v. State*, 806 S.W.2d 540, 543 (Tex.Crim.App.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). While the trier of fact is the sole judge of the weight and credibility of the witnesses, *Coe v. State*, 683 S.W.2d 431, 438 (Tex.Crim.App.1984); *Williams v. State*, 692 S.W.2d 671, 676 (Tex.Crim.App.1984), a guilty verdict should not be allowed to stand merely because the defendant was found to be the most likely assailant. A defendant, even the most likely defendant, is presumed to be innocent unless his guilt is established beyond reasonable doubt. *See* Tex.Code Crim.Proc.Ann. art. 38.03 (Vernon Supp. 1991); *see also Ardovina v. State*, 143 Tex.Crim. 43, 156 S.W.2d 983, 984 (1941); *Perkins v. State*, 32 Tex. 109, 112 (1869).

■ In a circumstantial evidence case, the State is not required to exclude every hypothesis that the criminal act may have been committed by another person. *Brandley v. State*, 691 S.W.2d 699, 703 (Tex.Crim.App.1985). However, the State must exclude every reasonable hypothesis raised by the evidence that tends to exculpate the accused. *Brandley*, 691 S.W.2d at 703.

### b. Analysis

The State's evidence shows that appellant and complainant both had Neissera Gonorrhea, and appellant had the opportunity for sexual contact with complainant. We examine the record to determine whether there is any corroborative evidence of sexual contact.

There was no outcry. The complainant did not testify. There was testimony that she did not remember any sexual assault. *Cf. Barnhart v. State*, 716 S.W.2d 572, 575 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd); *Voight v. State*, 662 S.W.2d 420, 422 (Tex.App.—Corpus Christi 1983, writ ref'd);

*People v. Whitfield,* 425 Mich. 116, 388 N.W.2d 206, 214 (1986). The members of complainant's family noticed nothing unusual on or around June 26, 1989. No one testified to any unusual conduct by complainant or appellant which suggests illicit physical contact. *Cf. Voight,* 662 S.W.2d at 421 (complainant's seven-year-old brother who slept in the same bed remembered Voight on top of his six-year-old sister).

The complainant had no physical signs of contact or penetration. There was no bruising, injuries, or sperm on or in the vaginal area. *Cf. id.* There was no evidence of sperm on the sheets. No one described complainant's clothing as ripped or disheveled. Further, the doctor testified that gonorrhea could be transmitted without sexual contact.

The father's testimony about the previous, suspicious white substance on the sheets is nothing more than that—a suspicion. This evidence does not even support an inference to connect appellant to the offense for which he was tried. *See Allen v. State,* 686 S.W.2d 685, 689 (Tex.App.—San Antonio 1985, no pet.).

Appellant was the only one of the men tested to have Neisseria gonorrhea on July 28, 1989. However, the evidence does not show whether appellant had gonorrhea on June 26, 1989.[1] The record reflects that several baby-sitters cared for complainant during the summer of 1989. Complainant's uncle, George, and her fourteen-year-old cousin, Curtis, as well as teenage boys in both the complainant's neighborhood and her babysitters' neighborhood may have had access to complainant. They were not tested.

Appellant's actions after June 26, 1989 are consistent with innocence. Appellant was asymptomatic, so he may not have known that he had gonorrhea. Still, he freely took the venereal disease exam. He then admitted to complainant's father that he tested positively for "something," although he said it wasn't a venereal disease. He also willingly gave complainant's father his test number so the father could call and confirm appellant's results. Moreover, there is no evidence that appellant fled prosecution or that he tried to influence the testimony of any witnesses. *Cf. Commonwealth v. Jackson,* 585 A.2d 36, 41 (Pa.Super.1991).

The evidence also raises the reasonable hypothesis that appellant did not have gonorrhea at the time the alleged assault took place. Both the nurse and the doctor testified that there is no test that conclusively confirms who infected complainant or how she contracted gonorrhea. The nurse testified that gonorrhea is an "extremely common" disease[2] and "thousands" of people in Dallas have gonorrhea. She further testified that appellant told her that he had two female sexual partners at the time in question. Finally, she testified that the incubation period for gonorrhea is two to fourteen days. Given the incubation period, it is just as reasonable to assume that appellant contracted the disease from his sexual partners anytime between July 14 to July 26, 1989, weeks after the alleged assault took place. The State did not exclude this reasonable hypothesis.

The limited circumstantial evidence, even when viewed in the light most favorable to the verdict, does not prove beyond a reasonable doubt that appellant had sexual contact with his three-year-old niece. The evidence only shows that complainant and appellant both had gonorrhea during the summer of 1989. Because appellant had the opportunity to commit this assault, he is a likely suspect. However, there is no other corroborating evidence. Although appellant may be the most likely assailant, the State did not sustain its burden. No rational juror could find each element of the offense beyond a reasonable doubt.

---

**1.** *See Mallory v. State,* 699 S.W.2d 946, 949 (Tex. App.—Texarkana 1985), *rev'd on other grounds,* 752 S.W.2d 566 (Tex.Cr.App.1988) (Texarkana court held that even though Mallory did not have gonorrhea on date of testing he might have been infected on the day of the alleged assault seven weeks earlier, based on expert testimony that gonorrhea could be cured by some over-the-counter drugs in a very short period of time).

**2.** *Cf. Commonwealth v. Jackson,* 585 A.2d 36, 39 (Pa.Super 1991).

We hold that the evidence is insufficient to support appellant's conviction. We sustain appellant's point of error. We reverse appellant's conviction and order entry of a judgment of acquittal. *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 24, 98 S.Ct. 2151, 2154, 57 L.Ed.2d 15 (1978).

LAGARDE, J., dissenting.

LAGARDE, Justice, dissenting.

I respectfully dissent. When reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found each element of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234, 238 (Tex.Crim.App. 1989). The standard applies equally to direct and circumstantial evidence cases. *See Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App.1984). We test every circumstantial evidence case by its own facts to determine the sufficiency of the evidence to support the conviction. *Freeman v. State,* 654 S.W.2d 450, 454 (Tex.Crim.App. 1983). Proof amounting to only a strong suspicion or mere probability is insufficient. *Id.* However, the standard does not require the State to prove to a moral certainty that the circumstances presented actually exclude every hypothesis that another person may have committed the criminal act. It must only exclude every hypothesis *raised by the evidence* that would tend to exculpate the defendant. It is enough that the cumulative force of all the incriminating circumstances warrants a conclusion of guilt. *Brandley v. State,* 691 S.W.2d 699, 703 (Tex.Crim.App.1985). The jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given their testimony; the jury is entitled to accept one version of the facts and to reject another. *Penagraph v. State,* 623 S.W.2d 341, 343 (Tex.Crim.App.1981). Conflicting evidence is not enough to warrant overturning a jury verdict. *Thomas v. State,* 458 S.W.2d 470, 473 (Tex.Crim.App. 1970).

Although the majority correctly stated the above standard *in the abstract,* they do not *apply* that standard. Rather, in their application of the standard to the facts, they view the evidence in the light *least favorable,* not *most favorable,* to the prosecution. A fair and complete summary of the evidence considered by the jury follows.

At the time of this offense, the three-year-old victim [1] resided in Dallas County with her parents and a five-year-old brother. Her mother did not work outside the home and was her children's primary caretaker. The mother spent most of her day with her children, "who [seldom] left her side." Because of their young ages, she did not allow them to just go off with other children to play. They only played with children of two other neighbors, and they did not go inside those neighbors' houses. They did not play with any other children. They did not go to church school, pre-kindergarten, or anything else. Although there were teenage boys who played in the neighborhood, there were none in the immediate area. On the occasions when complainant's mother could not supervise her children, she left them in the care of her sister-in-law or her grandmother. On the few occasions when the victim stayed with her grandmother, she was sometimes around her uncle George, who lived with her grandmother, and a teenage cousin, Curtis. The children were not often left with the grandmother because she was old. George was "always at work" and never babysat the children. Neither did Curtis. The victim was around George and Curtis only when her mother was there.

Gary Reagor, the victim's maternal uncle, frequently visited his sister, the victim's mother. He was a twenty-six-year-old single man who "probably dated numerous women." On June 26, 1989, Reagor visited the victim's family. Reagor spent the night there because he had had "bad luck" and his sister was the only person in

[1]. She was four years old at the time of trial.

the family who would have anything to do with him. He had no other place to stay. He slept on a pallet on the floor of the bedroom that complainant shared with her five-year-old brother. The room contained one bed, which the children shared. The children's room joined their parents' bedroom by way of a bathroom, with doors into each bedroom. On the night of the offense, the door to the parents' room was closed, but the children's door to the bathroom was open. The other door in the children's room, which opened into the kitchen, was removed from its hinges, leaving just an opening. There was no way the parents could have heard or seen what Reagor was doing unless they woke up, walked around through the kitchen, and went in the children's room. As usual, on that night, the victim wore only panties and a t-shirt as sleepwear. Both children are sound sleepers. "Drop a bomb, they wouldn't wake up." Neither complainant nor her brother gave any indication that Reagor or anyone else had sexually contacted her. Reagor may have stayed there after June 26, but his sister does not recall.

Three to seven days after Reagor's June 26 visit, complainant's mother noticed that complainant had a "slight discharge and was itching." Thinking that the discharge might be a yeast infection, the mother waited until July 19 before she took complainant to Dr. Melinda Uhrich at Parkland Hospital. She examined the complainant and gave her mother a cream in the event it was a yeast infection.

When Dr. Uhrich received complainant's positive lab result for Neisseria gonorrhea, she called a social worker and reported it to protective services. On July 27, a social worker visited complainant's parents at their home, where she informed them that complainant had Neisseria gonorrhea. Her father was devastated. He and his wife sat up the majority of that night discussing it, "trying to figure out how, who, when, and where, the circumstances." They determined that there were only four people with whom the victim could have had sexu-

al contact. Upon the social worker's suggestion, in an attempt to discover how complainant got gonorrhea, the complainant's father, her paternal grandfather, a paternal uncle, and Reagor went to a clinic to be tested for gonorrhea the next day. Reagor agreed to be tested, but was not told that the test was for a venereal disease. Afterwards, complainant's father asked Reagor the result of his (Reagor's) test. Reagor responded that it had come back positive for something, but not for venereal disease. However, when complainant's father called the clinic to verify the results, he learned that Reagor had actually tested positive for Neisseria gonorrhea. Reagor admitted to his sister, the victim's mother, that he had gonorrhea. However, he denied to her that he had molested the complainant. Complainant's father and the other men tested negative. The same night complainant's parents learned of Reagor's positive test result, they called the police. The police came to their house and took a report.

In addition to the facts set out above, complainant's parents testified at Reagor's trial about a previous suspicion they had involving Reagor and complainant. When complainant was still in diapers,[2] her parents hired Reagor to baby-sit their children. Complainant's father testified that, when he and his wife returned home after a three-hour absence, there was a "white and dried up" substance on the bed. Both parents testified that complainant's vaginal area "seemed to be widening or open. It looked wet. She didn't look right." In retrospect, the father thought that the substance was sperm. Complainant's father testified that on the earlier occasion he was suspicious of Reagor and talked to his wife about the possibility that the substance was sperm. His wife thought that it might have been possible, but she adamantly refused to believe it. Her only confrontation with Reagor was to tell him to change complainant's diapers more often. However, after the June 26 incident, both parents *totally* believed that Reagor was guilty. On cross-examination by defense counsel, the father testified:

2. The testimony is conflicting as to complainant's age at that time. The father testified that

she was two and the mother testified that she was one.

A. What am I trying to tell the jury that happened?

Q. Uh-huh.

A. I'm not trying to tell the jury anything that happened, that the facts kind of speak for themself [sic]. You'd have to be blind not to realize it.

Q. Well, no, I'm asking you what you say or tell this jury what you think happened in that home.

A. Okay. What happened in that home was, late that night everybody went to sleep, [the children] included. Gary took advantage of [complainant] while everybody was asleep.

I don't think [complainant] really remembers what happened because of the fact that she was asleep. I don't think that there was any penetration, but I do think that he, you know, rubbed himself up against her enough to create ejaculation, and that's what happened.

In response to a question from defense counsel suggesting that he did not like Reagor, the father testified:

A. I think a lot of Gary. I used to. I don't have any bad feelings personally against Gary. He's just like, you know, anybody else. I try to treat people like I like to be treated and, you know, that's just the way I am.

I tried to help him where I could. I don't have any hard feelings against Gary. I think I let him off leniently when I found him. But I've got faith in the processes of law. I feel like justice will be done.

Dr. Uhrich testified that it would be within a reasonable incubation period for complainant to have contracted gonorrhea on June 26 and not have manifested gonorrhea symptoms until July 19. The nurse from the sexually transmitted disease clinic testified that she had sixteen years experience working with sexually transmitted diseases. Based on that experience, she testified that two to fourteen days is a reasonable time for gonorrhea symptoms to become recognizable.

Testimony concerning transmission of gonorrhea was conflicting between the pediatrician, Dr. Uhrich, and the nurse from the sexually transmitted disease clinic. The pediatrician testified that, although it was "not impossible" to transmit gonorrhea by hand contact, provided there was a "good dose of gonorrhea germs" on the hand, a female child usually contracts gonorrhea when a male touches the tip of his infected penis against the child's vagina. The doctor found no evidence of penetration on complainant; however, she testified that no penetration or ejaculation is required to transmit gonorrhea. She explained that the bacteria of gonorrhea are found in the urethra and on the skin of the penis, not in the ejacula. The nurse testified that Reagor did not have gonorrhea of the mouth and that his gonorrhea was asymptomatic, meaning that he might not have been aware that he had the disease. The nurse testified that, although gonorrhea was a common disease, asymptomatic gonorrhea could only be transmitted by penis-to-vagina contact. She testified that three-year-old children do not walk around with gonococcal vaginitis without sexual exposure. The nurse personally saw Reagor and took his medical history. He told her that he had two sexual partners. The pediatrician did not test Reagor, did not know who did, and had not seen Reagor's test results. She did not know what kind of gonorrhea Reagor had. She testified that she could not say when Reagor got gonorrhea. Her medical background was in pediatrics, and she had not dealt with adult males with gonorrhea in a long time.

The father testified that the complainant would not be able to grasp the difference between the truth and a lie about something of this magnitude. She did not testify at trial. Reagor did not testify at trial.

In applying the sufficiency standard of review to the facts, I, unlike the majority, focus on all the evidence, admissible and inadmissible, that was before the jury. *Deason v. State*, 786 S.W.2d 711, 716 (Tex. Crim.App.1990). I view that evidence in the light most favorable to the verdict. *Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789; *Butler*, 769 S.W.2d at 238. Evidence not before the jury is irrelevant to a sufficiency inquiry. *Girard v. State*, 631 S.W.2d 162,

163 (Tex.Crim.App. [Panel Op.] 1982). The possibility of better evidence does not imply that the extant evidence is insufficient. *U.S. v. Kington,* 875 F.2d 1091, 1102–03, *reh'g denied,* 878 F.2d 815 (5th Cir.1989).

Although the State initially alleged both penetration and sexual contact, it abandoned the penetration means, leaving only the sexual contact theory to be proven. The elements the State must have proved are that: (1) Reagor (2) intentionally or knowingly (3) caused the sexual organ of a child to contact the mouth, anus, or sexual organ of another person, including Reagor.

The following facts are undisputed: At the time of the offense, the complainant was a three-year-old child. She contracted Neisseria gonorrhea. Reagor slept in the same room with her at a time within the incubation period. Reagor tested positive for the identical kind of gonorrhea as complainant, Neisseria. Her parents determined that only four men would have had access to sexual contact with complainant during the relevant time period. Those men were all tested and none, except Reagor, tested positive for gonorrhea; Reagor was asymptomatic. Reagor volunteered to take a test, but was not told that it was a venereal disease test. Reagor lied to complainant's father when he told him that he did not test positive for venereal disease. Prior to June 26, Reagor frequently visited his sister. After Reagor tested positive, complainant's father did not see Reagor until four months later. On that occasion, it was a chance meeting. The father was coming up the exit ramp to the expressway as Reagor was going on. The father immediately stopped, backed up, picked up Reagor, went and called the police, and had them come pick up Reagor. Complainant's parents were suspicious of Reagor's actions toward complainant on an earlier occasion because of the way her genitalia looked after he had baby-sat her. Penetration is not required to transmit gonorrhea. Reagor did not have gonorrhea of the mouth.

It was factually disputed whether gonorrhea must be transmitted exclusively by contact between penis and vagina or wheth-er it could be transmitted by hand-to-vagina contact. The jury resolved that issue in favor of the former. It was also factually disputed whether the complainant's parents called the police the night they learned of Reagor's positive test result or whether they called the police "on or about August 4, 1989." The jury's resolution of this dispute is, however, not essential to its guilty verdict.

## THE MAJORITY'S VIEW

### a. Most–Likely Assailant

The majority cite *Coe v. State,* 683 S.W.2d 431, 438 (Tex.Crim.App.1984), in support of its holding of insufficiency. *Coe* is not applicable. It is not a sufficiency case. Furthermore, the conviction in *Coe* was affirmed. They cite *Williams v. State,* 692 S.W.2d 671, 676 (Tex.Crim.App. 1984). *Williams* is inapplicable. It is not a sufficiency case. It, like *Coe,* was affirmed.

### b. Presumption of Innocence

The majority cite *Ardovina v. State,* 143 Tex.Crim. 43, 156 S.W.2d 983 (1941), and *Perkins v. State,* 32 Tex. 109 (1869), for the proposition that a defendant is presumed innocent. I do not disagree with the abstract principle stated in these cases. I certainly agree that Reagor was presumed innocent until the jury found him guilty beyond a reasonable doubt. I further agree that each element of the offense must be proved beyond a reasonable doubt. TEX.CODE CRIM.PROC.ANN. art. 38.03 (Vernon Supp.1991). In reviewing the evidence on appeal to determine whether it is sufficient to rebut that presumption, however, we must view the evidence in the light most favorable to the prosecution in determining whether the evidence *produced* was sufficient to *persuade* a rational factfinder of Reagor's guilt. We are not to sit as a thirteenth juror. *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

### c. Majority's Analysis Examined

This Court is required to view the evidence *presented to the jury* in the light

most favorable to the verdict. The majority, nevertheless, focus their review on evidence that was *not presented.* They reason that the evidence is insufficient because: there was no outcry; the complainant did not testify; the complainant did not remember the assault; and the family did not notice anything unusual on or about June 26, 1989. A rational factfinder could reason that those omissions were insignificant for the following reasons:

(a) the State was only required to prove contact, a touching—not penetration; (b) the complainant was a sound sleeper—"drop a bomb and [she] wouldn't wake up"—and slept through the incident; (c) the child was three years old; (d) her father testified that she would not know the difference between a truth and a lie on something of this magnitude; (e) she was unaware of the event; and (f) she was only four years old at the time of trial.

The majority further reason that the evidence was insufficient because there were: no physical signs of contact or penetration; no bruising, injuries, or sperm either on the complainant or the sheets; and the complainant's clothing was not ripped or disheveled. A rational factfinder could reason that those omissions were of no moment because:

(a) the State was only required to prove contact, not penetration; (b) neither ejaculation nor penetration was required to transmit gonorrhea; (c) complainant was only wearing panties, and they could easily have been partially re-moved or removed completely and replaced.

The majority also rely on the fact that there are thousands of men who have gonorrhea; that it is possible that someone else with gonorrhea had access to the complainant; and, further, that there is no evidence that Reagor had gonorrhea on June 26, 1989. A rational factfinder could reason that:

(a) there is no evidence that anyone else with access actually had gonorrhea either on that date or within a reasonable incubation period of that date; (b) in light of the mother's testimony, that no one else even had access; (c) Reagor tested positive for asymptomatic gonorrhea on July 19; and (d) one can reasonably infer that Reagor was infected on June 26, in light of the incubation period.

The majority further state as a reason for their holding that Reagor's actions were consistent with innocence. A rational factfinder could reason that Reagor's actions were *inconsistent* with innocence because he:

(a) was asymptomatic and may have been unaware that he had gonorrhea; (b) he took the exam for a venereal disease unwittingly; (c) he took the exam for venereal disease because he was unaware that he had gonorrhea, thus he had no fear of testing positive; (d) at that time, he was unaware that complainant had gonorrhea; (e) he lied to complainant's father; (f) complainant's father "got" Reagor's test information from the public health clinic, not that Reagor willingly gave it to him,[3] or that

---

**3.** The record reflects the following relevant testimony by the complainant's father on direct:

Q. And where did you go take the test?
A. At the public health clinic on Amelia, close to Harry Hines.
Q. And after you took the tests, what kind of information did you receive from the health clinic to find out about your test results?
Q. (By prosecutor) My question is: How were you going to find out about your results?
A. We received a number and written—written name and number to the tests that was—you know, each individual's tests. There was a number and your name with the number that came back, to give you the proper—you know, the outcome of the tests.

Q. Did you receive the name and number of people other than yourself?
A. Yes. I got everybody's name and number.
Q. Did they voluntary give you their name and number?
A. Yes.
Q. Let me ask you this: Who all went to take the tests with you?
A. My father, my brother, Gary Reagor and myself.
Q. Why did you take Gary, your father and your brother with you?
A. Because those were the people that [complainant] came in contact with, and would have had access to doing something like this.

Reagor felt a refusal would be suspicious; and (g) complainant's family did not see Reagor for four months after he tested positive (he had visited frequently before) and only then it was by chance.

The majority's view that someone else possibly could have had gonorrhea and transmitted it to the complainant is not reasonable on the evidence presented. Further, this view is inconsistent with the role of this Court in reviewing sufficiency of the evidence. As the court stated in *Girard:*

> Our task is not to ask whether we believe that the evidence at trial established guilt beyond a reasonable doubt; it is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Griffin v. State,* 614 S.W.2d 155, 159 (Tex. Crim.App.1981). In circumstantial evidence cases, this test is translated into the requirement that the evidence exclude every reasonable hypothesis other than guilt. *Id.* n. 5.

*Girard,* 631 S.W.2d at 163. Here, as in *Girard,* Reagor's argument that it is possible that someone else infected with gonorrhea transmitted it to the complainant is one for the jury. They apparently rejected that possibility, and a rational trier of the facts would have been justified in doing so in light of all the testimony. As the court in *Girard* said, "[t]he same is true of the inconsistencies, which are really suggestions that certain incriminating evidence was not found, rather than evidence which actually was inconsistent with guilt." *Girard,* 631 S.W.2d at 163–64. Further, the court in *Girard* teaches that such suggestions are not "reasonable hypotheses other than guilt" because

> the test of circumstantial evidence does not permit the alteration of the evidence to fit the hypothesis; obviously, there always will be a hypothesis of innocence if inculpatory evidence ... can be rejected. The correct procedure involves accepting the inculpatory circumstances, ... and then asking if there is a reasonable hypothesis other than guilt which

would also account for such circumstances.

*Girard,* 631 S.W.2d at 164.

Viewing the evidence in the light most favorable to the verdict, as I must, I conclude that the evidence is sufficient to allow a rational factfinder to conclude that there is no reasonable hypothesis raised by the evidence other than Reagor's guilt, and to find Reagor guilty on each element of the offense beyond a reasonable doubt.

I would affirm.