Dana K. McINTOSH, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–91–01015–CR.

Court of Appeals of Texas, Dallas.

April 19, 1993.

Rehearing Denied April 19, 1993.

David L. Botsford, Austin, for appellant.

Anne Wetherholt, Dallas, for appellee.

Before BAKER, KINKEADE and BURNETT, JJ.

## OPINION ON MOTION FOR REHEARING

KINKEADE, Justice.

We withdraw our opinion of February 5, 1993. This is now the Court's opinion.

Dana K. McIntosh appeals his conviction for murder. The jury assessed punishment at seventy-five years' confinement in the penitentiary. In nineteen points of error, McIntosh argues that (1) the trial court committed fundamental error in accelerating the pace of the trial, limiting the examination of witnesses, commenting on the weight of the evidence, failing to instruct the jury on the State's burden to disprove sudden passion, and including a special issue regarding the use of a deadly weapon in the charge; (2) the trial court committed reversible error in overruling McIntosh's objection to the State's expert's testimony on passion, overruling McIntosh's requested jury instruction on prior inconsistent statements, overruling McIntosh's objections to the State's introduction of extrinsic evidence of prior misconduct for impeachment purposes, and overruling McIntosh's motion for mistrial; (3) there was insufficient evidence to show that the State met its burden of negating sudden passion, that McIntosh, not a burglar, was guilty of murder, and that the grand jury used due diligence to ascertain the murder weapon thus creating a fatal variance between the evidence and the indictment because the identity of the murder weapon was known; and (4) the State's argument denied McIntosh a fair trial. Because the trial court did not commit fundamental or reversible error, there was sufficient evidence to convict McIntosh of murder, and McIntosh received a fair trial, we overrule all of McIntosh's points of error and affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

McIntosh pled not guilty to murdering his wife, Susan McIntosh. He testified at trial and maintained his innocence. At no time did McIntosh attempt to convince the jury that if he was guilty it was only of a lesser offense. His attorney limited his closing argument to this same position that the State failed to prove McIntosh committed the murder. After a five-day trial, the jury found McIntosh guilty of murder and sentenced him to seventy-five years in the penitentiary. Since there were no eyewitnesses to the crime, the jury's verdict was based solely on circumstantial evidence.

The evidence showed that Susan McIntosh, the defendant's wife, was stabbed twenty times in the garage of their home. During the direct examination of the State's expert witness, Dr. Jeffrey Barnard, who performed the autopsy on Mrs. McIntosh, the following exchange took place between the prosecutor and Dr. Barnard:

[PROSECUTOR]: You have, have you not, sir, had an occasion to read, study and just your practical experience through all of the autopsies, have been able to develop, have you not, some expertise in the classification of what type of an assault this was, as far as between for example passion or non-passion, acquaintances, strangers?

[DR. BARNARD]: In some cases, yes.

[PROSECUTOR]: Did you formulate an opinion in this case based upon your examination?

[DR. BARNARD]: Yes, sir, I did.

[PROSECUTOR]: All right. And how would you classify the assault?

[DEFENSE]: Judge, at this time we would renew our motion or objection that I have already brought to the attention of the Court.

[COURT]: Repeat yourself, sir.

[DEFENSE]: I renew the same objection I made to the Court.

[COURT]: Overruled.

[DR. BARNARD]: Restate the question.

[PROSECUTOR]: How would you classify this particular assault upon the person of Susan McIntosh, a passion assault or not?

[DR. BARNARD]: Well, yes.

[PROSECUTOR]: Strangers or acquaintances?

[DR. BARNARD]: Based on my experience these type of wounds, or these type

of homicides are committed by persons who are familiar with the deceased.

On redirect examination of Dr. Barnard, the prosecutor asked the following:

[PROSECUTOR]: Dr. Barnard, having told the Jury that it is your opinion that this was a crime of passion, between people that knew each other, having examined photographs of the garage, seen yourself in person the injuries to the left and right side of the face of Dana McIntosh, pieces of flesh removed, the defensive wounds, multiple defensive wounds to the hands of Susan McIntosh, and the cut on the Defendant's right hand, I will ask you if your examination and findings are consistent with Dana McIntosh having had a knife in his right hand, in his garage, having fought with, stabbed to death Susan McIntosh, while she fought him off as best she could with her hands, having scratched and left her marks upon his face, identifying him for time eternal as her killer, is that consistent?

[DEFENSE]: To which we would renew Trial Objection No. 1, which I referred to before, Your Honor.

[COURT]: The objection is overruled.

[DEFENSE]: Note our exception.

[COURT]: You can answer, Doctor.

[DR. BARNARD]: Yes.

The evidence during the trial revealed that Dana and Susan McIntosh had a good relationship until a few months before the murder. During those last few months before the murder, the evidence showed that Mr. McIntosh engaged in acts of sexual indiscretion and unethical financial practices. The evidence also showed that Mrs. McIntosh was a loyal, faithful wife with high moral and ethical standards. In the months before the murder, the evidence showed that there were numerous confrontations between Dana and Susan. The evidence also showed that Mr. and Mrs. McIntosh argued the Friday, Saturday, and Sunday before the Monday murder. On Monday, immediately after the murder, police investigators found a tassle from Dana McIntosh's shoe on the garage floor of his home. The day after the murder, family friends found Dana McIntosh's glasses on the floor of the garage. The day of the murder, Dana McIntosh appeared at work with bruises on his nose and serious scratches across his face. He was also wearing a different pair of glasses the day of the murder.

During jury argument at the guilt/innocence phase of the trial, the prosecutor responded to the defense attorney's claim that the State showed no motive for the murder with the following argument:

Motive, I don't know, we don't have to prove it, but I'm going to give you a couple of reasons. . . .

Now, he is running in Washington, he is going to strip joints, you know it and I know it, and he's going to them there. He's got x-rated tapes, Susan is a very moral person, anybody that knows her has told you that.

I will guarantee you from the evidence, that she's not going to allow that to go on, and there is one thing in her character that she will not tolerate, and that is adultery, infidelity, or unethical business practices. That is one reason. She found out and they got into it. That's one reason.

Another reason is the financial condition of those companies and she had been up there pouring [sic] over those books. You have got evidence of that, and she is upset by what is going on. He is in financial trouble, he stands to inherit all of the money, that two hundred and fifty-thousand dollars from the will. He also, in the past, has depleted her personal estate on his lousy business decisions. The IRS is after them, and I will submit to you that that is another reason that she might have confronted him, but they were having words, and it started because he was spending the time in Washington.

You think about this, and a woman's intuition about problems here, financial problems here, but he's got an apartment up there, he is flying back and forth every week, spending that money, and letting woman go here and friends that she has known, and coming in late. And you think that she would talk to him

about it? You bet she would. And that started, and you've seen it because he has come in Friday [before the murder on Monday] late and he was supposed to be in and didn't show, they've gone out, he is too tired on a Friday night, Saturday, well, they get into it out there about, he's got this little thing playing, and they go down there Sunday, and he is still yelling at her, and they go home. That is the last time two little girls ever see their mama. . . .

What else is there? His glasses. . . . But why are the glasses important? They are important because Susan slapped them off his face. That is why that eye piece is bent, and that is why he's got this mark here [demonstrating]. She slapped them off of his face right out in the garage. . . .

. . . What's happened is he and Susan have gotten into an argument in their garage, and I don't know if at this point in time she was dressed in her pantyhose and slip or bra, I'm not sure about that, but I do believe from the evidence that it started in the garage, why, because her reading glasses are there, the blood droplets on the inside, and his glasses where she slapped them off of his face were laying right by her body bent, the same way he found them. And I believe, that he took a knife and started carving on her and cut her throat.

The application paragraph of the court's charge at the guilt/innocence stage dealing with murder stated:

Now bearing in mind the foregoing instructions, if you find and believe from the evidence beyond a reasonable doubt that the defendant, Dana K. McIntosh, on or about the 19th day of March, 1990, in Dallas, County, Texas, did unlawfully then and there knowingly or intentionally cause the death of Susan K. McIntosh, an individual, by stabbing or cutting said Susan K. McIntosh with sharp edged instrument, the exact description of the instrument being unknown to the Grand Jurors, then, you will find the defendant

guilty of murder, as charged in the indictment, and you will make no finding in your verdict as to punishment.

If you do not so find and believe from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, then, you will find the defendant not guilty.

The court submitted only murder in its charge to the jury. McIntosh made no objection to the court's charge for failure to include any language relating to sudden passion or for failure to otherwise submit any instructions relating to sudden passion or voluntary manslaughter. The charge contained no instructions on voluntary manslaughter or any lesser included offenses or defenses, and the defense made no objections to the charge based upon these omissions.

The charge contained the following special instruction and special issue on the use of a deadly weapon in the commission of the murder:

You are further instructed that it will be your duty to determine a Special Issue regarding the use of a deadly weapon during the commission of the offense charged in the indictment.

A deadly weapon means anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury, or anything that in the manner of its use or intended use is capable of cuasing [sic] death or serious bodily injury.

Now, if you find and believe from the evidence beyond a reasonable doubt that the defendant did use or exhibit a deadly weapon during the commission of the offense for which you ~~have found~~ may find[1] him guilty in this case, then, you will answer yes on the verdict form provided for this Special Issue.

Unless you so find and believe from the evidence beyond a reasonable doubt, or if you have a reasonable doubt thereof, then, you will answer no on the verdict form provided for this Special Issue.

\*　　\*　　\*　　\*　　\*　　\*

---

1. The words "have found" in the special instruction were scratched out and the words "may find" were added by the judge before he gave the charge to the jury.

SPECIAL ISSUE: (Use one of the forms shown immediately below:)

We, the jury, find the defendant did use a deadly weapon in the commission of the offense charged in the indictment.

_____

Foreman.

We, the jury, find the defendant did not use a deadly weapon in the commission of the offense charged in the indictment.

_____

Foreman.

McIntosh made no objection to the special instruction and issue on the use of a deadly weapon.

## CONDUCT OF THE TRIAL COURT

In his first three points of error, McIntosh contends that the trial court committed fundamental error in prompting counsel to accelerate the pace of the trial, limiting the direct and cross-examination of witnesses, and commenting on the weight of the evidence. McIntosh argues that the cumulative effect of this conduct of the trial court denied him his right to due process and due course of law under the state and federal constitutions and article 38.05 of the Texas Code of Criminal Procedure.

McIntosh cites forty-one portions of the record as examples of the trial court's conduct in support of all three of these points of error. McIntosh, however, does not specify which of the forty-one portions of the record cited support which of the three points of error. McIntosh, instead, argues that the cumulative effect of the court's actions denied him a fair and impartial trial. Because McIntosh does not specify what cited portions of the record support each of these three points of error, McIntosh makes only a multifarious objection to the trial court's conduct and presents nothing for review by this Court. *Sanne v. State*, 609 S.W.2d 762, 772 (Tex. Crim.App.1980), *cert. denied*, 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 432 (1981); *Kendrick v. State*, 481 S.W.2d 877, 881 (Tex. Crim.App.1972).

In each of the forty-one instances of complained-of error, McIntosh cites no objec-

tion to the court, thereby waiving any error on appeal. *Sharpe v. State*, 648 S.W.2d 705, 706 (Tex.Crim.App.1983); *Hovila v. State*, 562 S.W.2d 243, 249 (Tex.Crim.App. 1978), *cert. denied*, 439 U.S. 1135, 99 S.Ct. 1058, 59 L.Ed.2d 97 (1979).

McIntosh seems to argue that the trial court's conduct amounted to fundamental error making an objection at trial needless. *See Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App.1984). Fundamental error must be so egregious and create such harm that the defendant has not had a fair and impartial trial. *Id.* at 171. McIntosh made no objection, no offers of proof or bills of exception; nor did he file a motion for new trial detailing the objectionable conduct of the trial court. McIntosh made no record of evidence he was prevented from offering at trial and at no time showed how the trial court violated his due process rights. Based upon the record before us, we cannot conclude that fundamental error resulted from the trial court's conduct. *See Kendrick*, 481 S.W.2d at 881 (no error based upon trial court's comments because the record did not reflect preservation of error from bias or prejudice from conduct and demeanor of the court by way of a motion for new trial or other means).

Because McIntosh failed to preserve error, waived error, and failed to show fundamental error, we overrule McIntosh's first three points of error.

## SUDDEN PASSION

In his fourth point of error, McIntosh contends that the State affirmatively raised the issue of sudden passion as that term is defined by the Texas Penal Code as an element of voluntary manslaughter through portions of the testimony of Dr. Barnard and the closing argument of the State. McIntosh argues that, because the evidence raised the issue of sudden passion, the trial court committed fundamental error for failing to include language in the application paragraph of the charge instructing the jury on the State's burden to

disprove sudden passion as an implied element of murder.

Since McIntosh made no objection to this portion of the charge, we first determine if there is error in the application paragraph of the trial court's instruction to the jury on murder. *See Ruiz v. State*, 753 S.W.2d 681 (Tex.Crim.App.1988); *Almanza*, 686 S.W.2d at 174. Then, we must determine if, on the facts of this case, the error was fundamental in that it was egregiously harmful and, therefore, denied McIntosh a fair and impartial trial. *See id.*

### Cobarrubio Error

■ In *Cobarrubio v. State*, 675 S.W.2d 749, 751 (Tex.Crim.App.1983), the court, quoting *Braudrick v. State*, 572 S.W.2d 709, 710 (Tex.Crim.App.1978), *cert. denied*, 440 U.S. 923, 99 S.Ct. 1252, 59 L.Ed.2d 477 (1979), held that causing death under the immediate influence of sudden passion arising from adequate cause is in the nature of a defense to murder that reduces that offense to the lesser included offense of voluntary manslaughter. *Cobarrubio*, 675 S.W.2d at 751. The State must prove the absence of the influence of sudden passion beyond a reasonable doubt to establish murder *if the issue of sudden passion is raised by the evidence. Id.* The Court of Criminal Appeals later clarified this ruling holding that when the evidence raises the issue of sudden passion, it is not a defense to murder, but the negation of sudden passion becomes an implied element of murder. *Bradley v. State*, 688 S.W.2d 847, 850 n. 3, 851 (Tex.Crim.App. 1985). Failure to include this implied element in the murder charge when raised by the evidence is error, *see Ruiz*, 753 S.W.2d at 684, but that error is not necessarily fundamental error. *Lawrence v. State*, 700 S.W.2d 208, 212–13 (Tex.Crim.App. 1985). The error must cause egregious harm to constitute fundamental error. *Id.*

■ To establish whether *Cobarrubio* error exists, this Court determines if the evidence raised the issue of sudden passion at all. The term "sudden passion" emanates from the definition of voluntary manslaughter. A person commits voluntary manslaughter if he causes the death of an individual under circumstances that would constitute murder, except that he caused the death under the immediate influence of sudden passion arising from adequate cause. Tex.Penal Code Ann. § 19.04(a) (Vernon 1989). Sudden passion as a term of art is that "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." Tex.Penal Code Ann. § 19.04(b) (Vernon 1989). Adequate cause is that "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." Tex.Penal Code Ann. § 19.04(c) (Vernon 1989). To raise the issue of sudden passion, there must be evidence of an adequate degree of provocation that produces such a degree of anger or terror when viewed objectively by a reasonable person. *Bradley*, 688 S.W.2d at 852. Evidence of former provocation standing alone is not enough. *Lawrence*, 700 S.W.2d at 210.

■ Dr. Barnard testified that the assault on Mrs. McIntosh was a crime of passion. The evidence also showed that (1) there were numerous conflicts between the McIntoshes in the months just before the murder, (2) McIntosh told a co-worker that Susan was "giving him grief" over traveling so much, (3) Susan McIntosh was upset on March 8, 1990, (4) Mr. and Mrs. McIntosh had a "screaming match" at Mr. McIntosh's office one Saturday night three weeks before her death, (5) McIntosh admitted having screaming matches with his wife, (6) Susan McIntosh had been coming up to Dana's office in the two weeks before the murder to look at Dana McIntosh's personal books, (7) Susan McIntosh was very upset Friday before the murder because Dana McIntosh was supposed to come back from Washington, D.C. on Thursday night but did not return until Friday afternoon, (8) on Friday night, Susan McIntosh was upset because Dana McIntosh was too stressed out, nervous,

and tired to stay out late and he was uncharacteristically taking the Lord's name in vain, (9) on Saturday night, Susan McIntosh was mad at Dana McIntosh because he scheduled meetings every night while they were supposed to be in Washington, D.C. the following week, and Dana McIntosh remarked that it would be hard to start dating again, (10) on Sunday, Dana and Susan McIntosh fought about when to leave her relatives' house in Tyler, (11) on Monday, Dana McIntosh had scratches on his face and body and bruises on his nose, and (12) on Tuesday, family friends found Dana McIntosh's broken glasses on the floor of the garage. On rebuttal, the prosecutor argued, in response to the defense argument that the State did not prove motive, that the evidence of McIntosh's infidelity and other indiscretions gave McIntosh a motive for killing his wife and that the McIntoshes had a confrontation in the garage that Monday morning during which McIntosh killed his wife.

We recognize that the evidence of sudden passion can come from any source. *See Ruiz*, 753 S.W.2d at 685. When we examine the record in this case, however, we see no evidence from any source that raised the term of art known as sudden passion and as defined by the Texas Penal Code. No evidence showed that Susan McIntosh provoked Dana McIntosh at the time of the murder. No evidence showed that Mr. McIntosh was enraged or angered making him incapable of cool reflection at the time of the murder. No evidence showed what happened between Mr. and Mrs. McIntosh nor Mr. McIntosh's state of mind just prior to the murder. There were no eyewitnesses to the murder. The only person that could testify regarding Susan McIntosh's sudden provocation, if any, of Dana McIntosh and Dana McIntosh's state of mind just before the murder was Dana McIntosh. Dana McIntosh testified he was not at the scene of the murder and did not kill his wife. At no time did he say he killed Susan McIntosh as a result of sudden passion from any cause. The jury convicted McIntosh on circumstantial evidence only. Under the circumstances of this case, there is no possibility that the evidence raised the issue of sudden passion. *See Bradley*, 688 S.W.2d at 851–52 (evidence of confrontation between appellant and the deceased just prior to the murder did not raise the issue of sudden passion because there was no testimony from any source to indicate appellant became enraged, resentful, or terrified immediately prior to the shooting).

We recognize that Dr. Barnard said that the murder was a "crime of passion." However, we conclude the evidence showed that Dr. Barnard did not use the term "passion" as the legal term "sudden passion" is defined in the Texas Penal Code. Dr. Barnard's testimony contained no evidence of Mrs. McIntosh's provocation nor Mr. McIntosh's state of mind just before the murder. Dr. Barnard's testimony that this was a crime of passion merely showed that the evidence in this case pointed the finger of guilt at someone known to the victim. Dr. Barnard's testimony failed to raise the issue of sudden passion as defined by the Texas Penal Code. The evidence of the marital discord and arguments in the days before the murder rose only to the level of former provocation, which does not raise the issue of sudden passion. *Lawrence*, 700 S.W.2d at 210. The evidence that McIntosh had scratches on his face and bruises on his nose was no evidence that Susan McIntosh provoked Dana McIntosh into killing her because he was incapable of cool reflection. In addition, the prosecutor's argument was not evidence and answered the defense argument that the State showed no motive for the murder. The prosecutor argued motive and identification, not sudden passion.

Because we find that the record raised no evidence of sudden passion, we need not consider the egregious harm element of the *Cobarrubio* test. We overrule McIntosh's fourth point of error.

## SUFFICIENCY OF THE EVIDENCE

In points of error five, seventeen, and nineteen, McIntosh argues that there was insufficient evidence to show that the State met its burden of negating sudden passion, that McIntosh, not a burglar, was guilty of

murder, and that the grand jury used due diligence to ascertain the murder weapon. In point of error eighteen, McIntosh contends that there was a fatal variance between the evidence and the indictment because the murder weapon was identified by the evidence.

### Standard of Review

 When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the·verdict to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Turner v. State,* 805 S.W.2d 423, 427 (Tex. Crim.App.), *cert. denied,* —— U.S. ——, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991). This standard supports the jury's responsibility, as the trier of fact, to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson v. State,* 672 S.W.2d 801, 804 (Tex.Crim.App.1982); *Robinson v. State,* 764 S.W.2d 367, 372–73 (Tex.App.—Dallas 1989, pet. ref'd). The jury, not this Court, may accept one party's statement of facts over another party, disbelieve one party's evidence even if uncontroverted, and resolve any inconsistencies in favor of one party over the other. *Jackson,* 672 S.W.2d at 804; *Robinson,* 764 S.W.2d at 372–73.

### Murder by Third Party and Negation of Sudden Passion

 In a circumstantial evidence case tried before November 6, 1991, the State need not have excluded *every hypothesis* that the criminal act may have been committed by another person. *Brandley v. State,* 691 S.W.2d 699, 703 (Tex.Crim.App. 1985), *cert. denied,* 498 U.S. 817, 111 S.Ct. 61, 112 L.Ed.2d 35 (1990); *Reagor v. State,* 816 S.W.2d 481, 483 (Tex.App.—Dallas 1991, pet. ref'd); *see Geesa v. State,* 820 S.W.2d 154 (Tex.Crim.App.1991). The State must only exclude every *reasonable* hypothesis raised by the evidence that would tend to exculpate the accused. *Brandley,* 691 S.W.2d at 703; *Reagor,* 816

S.W.2d at 483. It is enough that the conclusion of guilt is warranted by the force of all the incriminating circumstances. *Brandley,* 691 S.W.2d at 703; *Reagor,* 816 S.W.2d at 483. If the evidence presents such a reasonable hypothesis and the State does not disprove it, then the accused has not been proved guilty beyond a reasonable doubt. *Brandley,* 691 S.W.2d at 703; *Reagor,* 816 S.W.2d at 483.

 The evidence in this case viewed in the light most favorable to the verdict shows the following:

1. On March 19, 1990, paramedics arrived at the McIntosh home in response to a call and found the garage door open and a pool of blood in front of Mrs. McIntosh's car. The paramedics found no body. The paramedics closed and locked the house and left.

2. The police arrived after the paramedics left, and they secured the home.

3. A person could not get from the passenger side of Mrs. McIntosh's car to the door of the house in the garage by going in front of the car because some boxes blocked the passage. The refrigerator was next to the door to the house in the garage.

4. There were splatters of blood on the floor of the garage, the refrigerator, the license plate of the car, the overturned trash can next to the refrigerator, the open edge of the door to the house, and the door step, indicating Mrs. McIntosh was attacked on the ground in the garage of her home and the door to the house was open when she was attacked.

5. There was a tassel from Mr. McIntosh's shoe in the garage. McIntosh was wearing a pair of shoes with a missing tassel on the day of the murder.

6. Mrs. McIntosh's eye glasses were found in the garage. She never wore her glasses outside.

7. Mr. McIntosh's eye glasses were found underneath the front of Mrs. McIntosh's car and were bent and jammed. Mr. McIntosh claimed that the glasses fell out of his lap when he got out of the passenger side of the car the

night before the murder. Mr. and Mrs. McIntosh returned home from a trip to Tyler the night before the murder, and Mrs. McIntosh was driving. Mr. McIntosh had bruises on his nose the day of the murder consistent with the State's theory that there had been a struggle between Mr. and Mrs. McIntosh in the garage in which Mr. McIntosh's glasses were knocked off his face.

8. There was no sign of forced entry into the house.

9. Parts of the house had recently been vacuumed (the maid was there the previous Thursday). There was underwear lying on the floor of the master bedroom and bathroom. Otherwise, the inside of the house was neat on the day of the murder.

10. The McIntoshes were supposed to leave to go out of town for three days on the day of the murder, and the children were at a relative's house in Tyler.

11. There were invisible traces of blood in the master bathroom and bedroom indicating Mr. McIntosh tried to clean himself and the body after the murder. Mr. McIntosh explained that the blood was from scratches on his face that he got from the dog the morning of the murder and from when Mrs. McIntosh had her period earlier in the week causing her to get blood all over a silk dress that was never located. However, Mrs. McIntosh's hair and clothes were damp after the murder.

12. The jewelry that Mrs. McIntosh always wore was missing and was never found. Mr. McIntosh said that he took it to be cleaned. Mrs. McIntosh's purse was found in her daughter's closet. Mr. McIntosh said he put it there because he thought it belonged to his daughter. Mrs. McIntosh never went anywhere without her purse.

13. The autopsy showed that Mrs. McIntosh had 20 stab wounds made with an instrument with a serrated edge. Some of the stab wounds were made with an upward motion. Most of the stab wounds were directed at vital organs. There was a cut on her left ring finger indicating a ring had been re-moved possibly to dispose of physical evidence. There were bruises, abrasions and contusions all over the body. She also had defensive injuries consisting of abrasions and incised wounds on her hands indicating there was a struggle in which the murderer was probably injured.

14. The doctor performing the autopsy concluded that Mrs. McIntosh was killed by a sharp bladed/edged instrument consistent with a knife—the exact weapon unknown, that Mrs. McIntosh had been violently and brutally assaulted by someone she knew, that she was dressed when she was killed, that she was stabbed in the garage, that she scratched the killer, and that the killer took her clothes off and showered and washed himself and the body after the murder.

15. A knife was discovered in the alley four houses down from the McIntosh house, but it was never connected to the crime.

16. Mrs. McIntosh was a strong-willed person who would fight for her life.

17. Mr. McIntosh left the house for work the day of the murder between 8:45 a.m. and 9:15 a.m. He was driving fast and wiping his face with a cloth. Mr. McIntosh lived five to ten minutes from work. A co-worker saw him pull into the visitor's parking lot around 9:30 a.m. However, Mr. McIntosh did not arrive in the office until approximately forty-five minutes later. Mr. McIntosh's daughter attempted to call him at 9:02 a.m. about her medication, but he was not yet in the office and did not arrive until sometime later. She tried to call home about that same time, but no one answered. On the day of the murder, Mr. McIntosh yelled at an employee, which was unusual behavior.

18. On the day of the murder, Mr. McIntosh wore a different pair of glasses than normal to work. He had abrasions on the side of his nose and chest, a cut on his right hand and more than twenty scratches on both sides of his face. He

was also rubbing his face with a cloth. Mr. McIntosh stated that the scratches were from his dog. However, the dog was gentle and old and had health problems. The scratches were not consistent with a dog's paw because they were too wide, too far apart, and in too many different directions.

19. On the day of the murder, Mr. McIntosh told a co-worker, Gary, that he needed to go back to the house and pick up Mrs. McIntosh's car and take it in for repairs. Mr. McIntosh called to see if Mrs. McIntosh was home but got no answer. Mrs. McIntosh went to Bible study every Monday from 10:00 a.m. to 11:00 a.m. Mr. McIntosh knew Mrs. McIntosh went to Bible study. Also on Sunday, Mr. McIntosh discussed with Mrs. McIntosh taking the dog to the kennel and picking up some prescription medicine on Monday. Even though Mr. McIntosh knew Mrs. McIntosh would not be home, he and Gary went to the house in Mr. McIntosh's car to pick up Mrs. McIntosh's car. When they got to the house, the garage and back door were closed. Mr. McIntosh went into the garage to check on Mrs. McIntosh and found her body in front of the car. Gary called 911, but Mr. McIntosh insisted on taking Mrs. McIntosh to the hospital. Mr. McIntosh put the body in his car, and Gary drove. Mr. McIntosh insisted that they go to Doctors' Hospital instead of Presbyterian Hospital even though Gary did not know the way. At the hospital, Mr. McIntosh began sucking on Mrs. McIntosh's fingers. He knew that his tissue would be under Mrs. McIntosh's fingernails but said the tissue was from their lovemaking earlier that morning or from when she put lotion on his face earlier that morning.

20. Mr. McIntosh had a knife in his car and two knives and a pistol at home. These knives were never linked to the murder. He was an assassination squad leader in Viet Nam and wanted to seal his military file after the murder. He stated that if he was going to kill his wife, he would have made one stab wound at the sternum and ripped up.

Some of the wounds on Mrs. McIntosh's body were made with an upward motion. Most of the stab wounds were directed at vital organs. Although there was testimony that the wounds were not consistent with someone trained in killing, the evidence that some of the wounds were made with an upward motion and the wounds were directed at vital organs was consistent with McIntosh's testimony about how he would have killed someone as a trained killer. The jury could infer from this evidence that the wounds were consistent with someone trained in killing.

21. The McIntoshes were having marital troubles over finances and his infidelity and had been arguing over various issues up until the day before the murder.

McIntosh contends that Mrs. McIntosh was killed by a burglar in the garage. This hypothesis was not raised or supported by the evidence and is not reasonable. Nothing in the evidence showed any sign of forced entry or other evidence of a burglary. Nothing was stolen. McIntosh admitted that he took the missing jewelry to the jewelers to be cleaned and that he put Mrs. McIntosh's purse in their daughter's room. The house was neat and recently vacuumed. The State had no burden to negate such a hypothesis which was not supported by the evidence. Reviewing the evidence in the light most favorable to the State, there is sufficient evidence to support the State's theory that McIntosh murdered his wife. No evidence raised the theory that a burglar murdered Susan McIntosh.

McIntosh gives twelve reasons why the evidence supported the theory that Mrs. McIntosh was killed by a third party. However, no evidence supported McIntosh's theory. The evidence was sufficient to allow the jury to make the following inferences, contrary to McIntosh's contentions:

1. Mrs. McIntosh was in the garage, she had her glasses on her face because she did not intend to go outside, and she was killed by her husband, not a burglar.

2. Mrs. McIntosh's jewelry was missing because Mr. McIntosh disposed of it to get rid of evidence of blood and other tissue. Mr. McIntosh testified that he took it to be cleaned.

3. The jury could have given no weight to the State's failure to connect the knives that the police found to the killing and still have found Mr. McIntosh guilty.

4. The McIntoshes were having marital problems. Evidence that Mr. and Mrs. McIntosh made love the morning of the murder does not negate the evidence of marital discord.

5. The defensive wounds on Mr. McIntosh were consistent with Mrs. McIntosh's wounds. Mrs. McIntosh could have defended herself by covering her face with her hands, thereby receiving scratches on her hands, and, at the same time, inflicted offensive wounds on her murderer. Mrs. McIntosh was strong-willed. Mr. McIntosh's scratches were not caused by a dog. Mr. McIntosh knew his tissue would be under Mrs. McIntosh's fingernails, and that is why he sucked them.

6. The wounds on Mrs. McIntosh's body were consistent with wounds made by someone trained in killing. Some of the wounds had an upward motion, and most were directed at vital organs. This evidence was consistent with McIntosh's testimony of how he would have killed someone as a trained killer.

7. The fact that the police lost evidence or failed to protect the crime scene is irrelevant because the jury could have convicted McIntosh on the evidence presented to it.

■ There was also sufficient evidence for the jury to reasonably infer that this was murder. As discussed previously, there was no evidence of Mrs. McIntosh's provocation or Mr. McIntosh's incapability of cool reflection just before the murder to support a jury finding that the crime was one of sudden passion. The State had no burden to negate sudden passion because the evidence did not raise the issue of sudden passion as we found in point of error number four. The theory that this was a crime of passion was negated because the evidence does not even raise the issue of sudden passion.

## Grand Jury Determination of the Murder Weapon

The indictment alleged that McIntosh caused the death of Susan McIntosh by stabbing and cutting her "with a sharp edged instrument, the exact description of the said instrument being unknown to the Grand Jurors...." At trial, the murder weapon was never introduced into evidence or otherwise identified. The knives found in the alley and in the McIntosh's home were never linked to the murder. Dr. Barnard testified that the wounds to Mrs. McIntosh's body were made by an instrument with a serrated edge. Dr. Barnard saw a body riddled with cutting wounds consistent with a serrated blade, like a kitchen knife. In his opinion, the cause of death was being stabbed and cut with a sharp-bladed/edged instrument consistent with a knife, but the exact description of the instrument was unknown.

■ When an indictment alleges that the manner and means utilized to inflict an injury are unknown, and the evidence at trial does not show what instrument was used, a prima facie showing exists that the object was unknown to the grand jury. *Matson v. State*, 819 S.W.2d 839, 847 (Tex. Crim.App.1991); *Cunningham v. State*, 484 S.W.2d 906, 911 (Tex.Crim.App.1972). Consequently, the State must show grand jury due diligence only when the evidence reveals that the identity of the unknown thing was known or capable of being discovered. *Matson*, 819 S.W.2d at 847; *Polk v. State*, 749 S.W.2d 813, 817 (Tex.Crim. App.1988).

■ In this case, we find no evidence indicating that the murder weapon was known or capable of being discovered. McIntosh argues that the evidence showed the murder weapon was a knife. The evidence, however, indicated that, while the murder weapon could have been a knife, the exact description of the instrument was unknown. Because there was no evidence

identifying the murder weapon, the State did not have to prove that the grand jury exercised due diligence in attempting to discover the murder weapon. *Matson*, 819 S.W.2d at 847–48 (no evidence of grand jury due diligence necessary because the testimony demonstrated strangulation by either the use of hands or some other un-identified object); *Polk*, 749 S.W.2d at 817. The "unknown" allegation in the indict-ment was supported by the evidence, and thus, no question of variance in the proof was raised. *See Polk*, 749 S.W.2d at 817; *Cunningham*, 484 S.W.2d at 911.

Because the evidence was sufficient for a trier of fact to find that McIntosh, not a burglar, murdered his wife, that the crime was not one of sudden passion, and that the identity of the murder weapon was unknown, we overrule McIntosh's fifth, seventeenth, eighteenth, and nineteenth points of error.

### OBJECTIONS TO DR. BARNARD'S TESTIMONY

In his sixth and seventh points of error, McIntosh contends that the trial court committed reversible error in overruling his objections to Dr. Barnard's testimony that (1) this was a crime of passion, (2) Mrs. McIntosh was killed by an acquaintance, and (3) the facts were consistent with McIntosh being the killer. McIntosh argues that this testimony of Dr. Barnard was novel scientific evidence and was inad-missible under rule 702 of the Texas Rules of Criminal Evidence and the factors set out in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim.App.1992).

■■■■ Rule 702 of the Texas Rules of Criminal Evidence provides that if scienti-fic, technical, or other specialized knowl-edge will assist the trier of fact to under-stand evidence or to determine a fact in issue, an expert witness may testify there-to in the form of an opinion or otherwise. TEX.R.CRIM.EVID. 702. The decision wheth-er to allow the testimony of an expert witness is within the sound discretion of the trial court. *Duckett v. State*, 797 S.W.2d 906, 910 (Tex.Crim.App.1990). The trial court's decision shall not be over-turned except upon a showing of an abuse of that discretion. *Amos v. State*, 819 S.W.2d 156, 163 (Tex.Crim.App.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1959, 118 L.Ed.2d 561 (1992). The threshold determi-nation for admitting expert testimony is whether the specialized knowledge will as-sist the trier of fact to understand the evidence or to determine a fact in issue. *Pierce v. State*, 777 S.W.2d 399, 414 (Tex. Crim.App.1989), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990). Ex-pert testimony is admissible if it is useful to the jury even if the testimony embraces the ultimate issue in the case. TEX.R.CRIM. EVID. 704.

■■■■ The main issue in this case was identity. No one saw McIntosh kill his wife, and McIntosh denied even being pres-ent at the murder. Dr. Barnard testified that, based upon his experience in conduct-ing numerous autopsies in which the bodies had the types of wounds received by Mrs. McIntosh, this was a passion assault com-mitted by a person known to the deceased. The photos of the garage, the defensive wounds, the scratches on McIntosh, and Mrs. McIntosh's injuries were all consistent with the theory that McIntosh killed his wife in Dr. Barnard's opinion.

Dr. Barnard's testimony was not a novel scientific theory such as DNA testing. His testimony was based upon his experience, observations, and training in conducting numerous autopsies and examining physi-cal evidence. Dr. Barnard's opinion of what the evidence showed about identity helped the jury to make a correlation be-tween the types of wounds on a body and the identity of the killer. We hold that Dr. Barnard's testimony was admissible be-cause it presented a body of expertise, with which the jurors were unfamiliar, that was relevant in determining the issue of identi-ty under the facts of this case. *See Her-nandez v. State*, 772 S.W.2d 274, 275 (Tex. App.—Corpus Christi 1989, no pet.) (doctor allowed to testify that knife wound was intentional and not accidental based upon other knife wounds he had seen). Thus, the admission of this testimony clearly met

the tenets of rule 702 of the Texas Rules of Criminal Evidence.

Because the trial court did not abuse its discretion in admitting the identity testimony of Dr. Barnard, we overrule McIntosh's sixth and seventh points of error.

### IMPEACHMENT BY EVIDENCE OF EXTRINSIC ACTS

In his eighth and ninth points of error, McIntosh complains that the trial court committed reversible error in overruling his requested jury instruction regarding prior inconsistent statements of defense witnesses, Chuck Williams, Bob Parma, and McIntosh himself. In his tenth and eleventh points of error, McIntosh contends that the trial court committed reversible error in overruling his objections to the State's introduction of extrinsic evidence of alleged prior acts of misconduct that impeached him on collateral matters.

### Evidence

During the cross-examination of Williams, the State used Williams' grand jury testimony to refresh his recollection that McIntosh acted strangely the day of the murder, including the fact that McIntosh was late for work the morning of the murder. The State, on cross-examination of Parma, also used his prior grand jury testimony to refresh his recollection about McIntosh's financial difficulties prior to the murder.

On cross-examination, McIntosh admitted that, when he was in Washington, D.C. on business, two women would occasionally prepare him dinner at his Washington, D.C. apartment. McIntosh denied telling Andy James that James could not stay in his Washington, D.C. apartment one night when the two women would be there making dinner. The State called Andy James on rebuttal. James testified, over McIntosh's objection of improper impeachment, that McIntosh said he could not stay at the apartment the night the two women were coming to the apartment.

During the State's direct examination of Deborah Vieau, Vieau testified that McIntosh told her he often enjoyed frequenting strip joints in Dallas and Washington, D.C. During the State's direct examination of Ken Hollera, Hollera said that McIntosh told him he "finger painted women" at a club in Washington, D.C. McIntosh objected to the testimony of Vieau on the ground that it had no relevance to any issue in the case and to the testimony of Hollera on the ground of improper impeachment.

### Limiting Instruction

McIntosh requested a limiting instruction that the prior inconsistent statements of McIntosh, Williams, and Parma could be considered for determining credibility but not to establish guilt. The trial court overruled the request. McIntosh contends that he was entitled to the limiting instruction under rule 105 of the Texas Rules of Criminal Evidence because the State used the prior inconsistent statements of McIntosh, Williams, and Parma solely for purposes of impeachment. TEX. R.CRIM.EVID. 105.

Rule 105 of the Texas Rules of Criminal Evidence provides that when evidence that is admissible for one purpose but not admissible for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly. TEX.R.CRIM.EVID. 105(a). McIntosh argues that because the only purpose of the prior inconsistent statements was impeachment, his limiting instruction was mandatory.

We do not agree that the only purpose of the prior inconsistent statements was impeachment. Identity and motive were issues in this case. The statements that McIntosh was late for work and was acting differently than normal at the time of the murder were evidence of identity. The statements regarding McIntosh's financial troubles and infidelity were evidence of motive. These statements were admissible because they were based upon the personal knowledge and observations of the witnesses, they showed McIntosh's state of mind (such as motive), and they were admissions and statements against interest made by McIntosh. *See* TEX.R.CRIM.EVID. 602, 801(e)(2), 803(3), 803(24). Because the prior

inconsistent statements complained of by McIntosh were admissible as substantive evidence of motive and identity, the trial court did not err in refusing McIntosh's limiting instruction on impeachment.

**Testimony of James, Vieau, and Hollera**

■ The trial court has broad discretion to admit or deny evidence. *See Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim.App.1990). This Court will not overturn a trial court's ruling on the admission of evidence except upon a showing of abuse of that discretion. *See id.* McIntosh contends that the trial court abused its discretion in overruling his objections to the testimony of James, Vieau, and Hollera on the basis of relevancy or extrinsic evidence of prior misconduct used for impeachment. *See* TEX.R.CRIM.EVID. 401, 402, 608(b).

■ James' testimony that McIntosh would not let him stay at the Washington, D.C. apartment because women would be there fixing dinner was evidence of McIntosh's infidelity. Vieau and Hollera's testimony that McIntosh frequented strip joints and "finger painted women" was also evidence of McIntosh's infidelity. McIntosh's infidelity was a motive for killing his wife. The statements of James, Vieau, and Hollera showing McIntosh's prior misconduct of infidelity were admissible to show motive under rule 404(b) of the Texas Rules of Criminal Evidence. TEX.R.CRIM.EVID. 404(b). The statements were otherwise admissible as admissions and statements against interest under rules 801(e)(2) and 803(24) of the Texas Rules of Criminal Evidence. TEX.R.CRIM.EVID. 801(e)(2), 803(24). The evidence was relevant to the issue of motive since McIntosh denied that he was having marital troubles. *See* TEX.R.CRIM. EVID. 401, 402; *Montgomery*, 810 S.W.2d at 391–93.

■ McIntosh alleges that this testimony could not be used to show motive because there was no evidence that Mrs. McIntosh knew about the acts of infidelity. McIntosh, therefore, argues that the State's contention that this testimony showed motive is really a smoke screen.

There was evidence that Mrs. McIntosh was a good, moral woman. There was evidence that Dana McIntosh engaged in indiscretions and other unethical acts and was having financial troubles. There was also evidence that the McIntoshes began having marital troubles about the same time that Dana McIntosh began engaging in these acts of indiscretion. A few weeks before the murder, the evidence shows that Susan McIntosh began spending time reviewing her husband's personal books at his office. The evidence also shows that the McIntoshes began having arguments during this same time period, which was uncharacteristic of them. The jury could infer from this evidence that Mrs. McIntosh knew about the acts of infidelity and that this knowledge gave McIntosh a motive for killing his wife. Accordingly, evidence of McIntosh's infidelity through the testimony of James, Vieau, and Hollera was not extrinsic evidence of prior misconduct used solely for impeachment on collateral matters.

Because the statements of Williams, Parma, McIntosh, James, Vieau, and Hollera were evidence of substantive issues and were not used solely for impeachment purposes, we overrule McIntosh's eighth, ninth, tenth, and eleventh points of error.

## EVIDENCE OF SUSAN MCINTOSH'S INTOLERANCE OF IMMORALITY

In his twelfth point of error, McIntosh argues that the trial court committed reversible error in overruling his motion for mistrial after the State attempted to elicit testimony that Susan McIntosh would not have tolerated McIntosh's acts of immorality and infidelity if she had known about them. In his thirteenth point of error, McIntosh contends that the State's final argument that Susan McIntosh would not have tolerated McIntosh's acts of immorality and infidelity denied McIntosh a fair trial.

During the State's redirect examination of Marlin Price, the State asked if Susan McIntosh would have put up with the acts of immorality and infidelity of her husband

if she had known about them. Before the State finished this question, McIntosh objected. The court sustained the objection, gave an instruction to the jury to disregard, and admonished the State not to ask any more questions along these lines. McIntosh's motion for mistrial was denied. In closing, the State argued, as a motive for McIntosh murdering his wife, that Mrs. McIntosh would not have tolerated McIntosh's acts of immorality and infidelity. McIntosh did not object to this argument of the State.

■■■■■ McIntosh argues that overruling his objection and instructing the jury to disregard did not prevent harm because the State's closing argument denied him a fair trial. Therefore, McIntosh argues that his motion for mistrial should have been granted. Generally, any error in asking an improper question is cured and rendered harmless by an instruction to disregard. *Ransom v. State*, 789 S.W.2d 572, 585 (Tex. Crim.App.1989). There must be a showing of obvious harm despite the instruction to disregard before a mistrial is proper. *Id.* We find nothing in the record which shows that McIntosh was obviously harmed despite the instruction to disregard. McIntosh did not even object to the portion of the State's closing argument that he contends rendered the limiting instruction ineffective. We, therefore, conclude that the trial court did not abuse its discretion in denying McIntosh's motion for mistrial.

■■■■ Generally, a defendant must make a timely, proper, and specific objection to improper jury argument to preserve the complaint for appellate review. TEX. R.APP.P. 52(a); *Miller v. State*, 741 S.W.2d 382, 391 (Tex.Crim.App.1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2835, 100 L.Ed.2d 935 (1988). However, when the improper jury argument is so prejudicial that an instruction to disregard could not cure the harm, a defendant does not have to object. *Harris v. State*, 784 S.W.2d 5, 12 (Tex. Crim.App.1989). McIntosh argues that no objection was necessary because the State's argument constituted fundamental error and that an instruction would not have cured the harm.

■■■■ Our review of the record as a whole does not show that the State's argument was fundamental error. *See Willis v. State*, 785 S.W.2d 378, 385 (Tex.Crim.App. 1989), *cert. denied*, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 234 (1990). The evidence showed that Mrs. McIntosh was a very moral person. The evidence also showed that Mr. McIntosh engaged in acts of immorality and infidelity. The State could have reasonably inferred from the evidence that Mrs. McIntosh would not have tolerated Mr. McIntosh's acts of immorality and infidelity. Reasonable deductions from the evidence are a proper subject of jury argument. *Walker v. State*, 664 S.W.2d 338, 340 (Tex.Crim.App.1984). The State's jury argument did not deny McIntosh a fair trial.

Because the trial court's limiting instruction rendered the State's question harmless and the State's jury argument was not so prejudicial as to constitute fundamental harm, we overrule McIntosh's twelfth and thirteenth points of error.

## SPECIAL INSTRUCTION ON THE USE OF A DEADLY WEAPON

In his fourteenth, fifteenth, and sixteenth points of error, McIntosh contends that the trial court committed fundamental error in submitting a special instruction and special issue on the use of a deadly weapon at the guilt/innocence stage of the trial. McIntosh argues that the special instruction and issue violated the presumption of innocence and articles 37.07 and 38.05 of the Texas Code of Criminal Procedure.

At the charge conference after the guilt/innocence stage of the trial, McIntosh requested a special instruction and issue on the use of a deadly weapon. The record, however, does not reflect what form of special instruction and issue on the use of a deadly weapon, if any, McIntosh requested. McIntosh did not object to the form of the special instruction and issue on the use of a deadly weapon submitted to the jury.

McIntosh now contends that he did not have to object because the form of the

special instruction and issue on the use of a deadly weapon was fundamental error. *See Almanza,* 686 S.W.2d at 171. McIntosh argues that the use of the special issue at the guilt/innocence stage of the trial was egregious harm so as to deny him a fair trial for three reasons: (1) the failure to condition the special issue on a finding of guilt violated the presumption of innocence and was a comment on the weight of the evidence, (2) the jury could still see the words "have found" even after they were scratched out, which violated the presumption of innocence and was a comment on the weight of the evidence, and (3) article 37.07 of the Texas Code of Criminal Procedure requires a general charge at the guilt/innocence stage.

The trial court is not prohibited from submitting a special issue on the use of a deadly weapon at the guilt/innocence stage of the trial as long as the defendant had notice that the use of a deadly weapon was an issue in the case. *Luken v. State,* 780 S.W.2d 264, 268–69 (Tex.Crim.App. 1989) (evidence of the weapon used would be admissible at the guilt stage as a fact of the offense; that the use of a deadly weapon was erroneously made an issue to be resolved concurrently with the question of guilt could not have so inflamed or distracted the jury as to deprive defendant of a fair trial). The indictment charged McIntosh with knowingly and intentionally causing the death of Susan McIntosh by stabbing and cutting her with a sharp-edged instrument, the exact description of the instrument being unknown. An allegation that a death was caused by a weapon or instrument necessarily includes an allegation that the weapon or instrument was capable of causing death in the manner of its use. *Ex parte Beck,* 769 S.W.2d 525, 526 (Tex.Crim.App.1989). The indictment, therefore, gave McIntosh notice that the use of a deadly weapon would be an issue in the case. *See id.*

The jury found McIntosh "guilty of murder, as charged in the indictment." Since the indictment gave notice of the use of a deadly weapon, the jury's verdict of guilty necessarily implied an affirmative finding of use of a deadly weapon. *Id.; Polk v. State,* 693 S.W.2d 391, 394 (Tex. Crim.App.1985); *Blackwell v. State,* 818 S.W.2d 134, 140 (Tex.App.—Waco 1991, pet. ref'd). The special issue on use of a deadly weapon was, therefore, unnecessary. Any harm in failing to condition the special issue and in scratching out the language "have found" was not so egregious as to deny McIntosh a fair trial. *See Luken,* 780 S.W.2d at 268–69. The guilty verdict implied an affirmative finding of use of a deadly weapon, so any error in the special issue on use of a deadly weapon was harmless.

Because the trial court is not prohibited from submitting a special issue on use of a deadly weapon at the guilt/innocence stage and any error in the special issue was harmless, we overrule McIntosh's fourteenth, fifteenth, and sixteenth points of error.

### CONCLUSION

From our review of the record, we find no fundamental or reversible error of the trial court as alleged by McIntosh. We further find sufficient evidence to convict McIntosh of the murder of his wife. The record shows that McIntosh received a fair trial.

We affirm the trial court's judgment.