# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00338-CR

**Kenneth Gregory Knight, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE 26TH DISTRICT COURT OF WILLIAMSON COUNTY
## NO. 19-1197-K26, THE HONORABLE DONNA GAYLE KING, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Kenneth Gregory Knight was convicted of capital murder and was sentenced to life imprisonment without the possibility of parole. *See* Tex. Penal Code §§ 12.31, 19.03. In two issues on appeal, Knight contends that the evidence was insufficient to support his conviction and that the trial court erred by denying his motion for mistrial after the State elicited testimony regarding a prior robbery. We will affirm the trial court's judgment of conviction.

## BACKGROUND

At 9:37 a.m. on February 18, 2019, a 911 dispatcher received a call from a man identifying himself as Knight and stating that he had been shot, that he was in the apartment of the man who shot him, and that the person who shot him was dead. The 911 dispatcher directed police and EMS to the apartment where Knight was calling from. When the police arrived on the scene, Knight opened the apartment door. The police entered the living room of the apartment,

observed that Knight was bleeding from his head, and noticed that a deceased man was in the living room on his knees with the top portion of his body face down on the couch. The deceased man was later identified as John Scott Lyman. After the police secured the scene, Knight was transported to the hospital and treated for a gunshot wound to his face.

While in the apartment, the police observed a pair of jeans on the coffee table with the pockets pulled outward; a black duffel bag near the couch containing a ticket for someone named Mark Taylor and books, including one with an inscription for "Mark"; and a stack of money totaling $550 to the left of the couch. When walking through the apartment, the police noticed that cabinet doors had been left open and that the mattress in Lyman's bedroom had been partially pulled off the bedframe. The police found on the couch "a black and pink SIG Sauer Mosquito" semiautomatic firearm that used .22 caliber ammunition and found a small Derringer revolver on the kitchen floor that also used .22 caliber ammunition. The Derringer was on the opposite side of the apartment from Lyman's body. The bullets inside the chambers of both weapons were from the same Federal brand, but the ammunition inside the magazine for the SIG Sauer was a different brand. The police also observed fired cartridge cases on the living room carpet, by the kitchen bar stools, near the door to Lyman's bedroom, and near the pantry door, and the police discovered projectiles in the wall by the patio door and in the pantry.

The police noticed apparent blood throughout the apartment, including on the living room floor; on a light switch and alarm panel near the front door; on the coffee table near the couch; on two $100 bills on the living room floor; on the kitchen floor; underneath the bar stools in the kitchen; on cabinet door handles; on the refrigerator; near the entrance to Lyman's bedroom; in Lyman's bedroom at the base of Lyman's bed, on the mattress, and on the sheets; on the duffel bag; and on the black and pink Sig Sauer. The police collected blood samples from

2

those locations for testing and observed that there were shoe impressions in the blood on the living room carpet and on the kitchen floor.

Inside the apartment, the police found an iPhone near the front door and two Samsung cell phones. As part of their investigation, the police determined that the Samsung phones belonged to Lyman, that the iPhone was registered to Mark Taylor, and that the iPhone had the same number as the phone that had been used to call 911 on the morning of the offense. While some officers covered the crime scene, others talked with Lyman's neighbors to see if they witnessed anything. One of the neighbors informed the police that while he was outside, he saw a man carrying a black duffel bag walk up to and knock on Lyman's door. The neighbor had never seen the man before. After Lyman opened the door, Lyman and the man had an awkward conversation in which the man asked to come inside and use the restroom to which Lyman told the man no. The neighbor told the police that he heard gunshots after he went inside.

As part of their investigation, the police searched the following cars found in the parking lot of the apartment complex: a black Kia that they believed Knight drove to the scene and a BMW and an Acura that both belonged to Lyman. In the glovebox for the Acura, there were two stacks of money totaling $20,000. Inside the black Kia, the police found Knight's automobile insurance card and two LG cell phones that belonged to him, but the police also found a stack of identification cards for Taylor.

Another officer went to the hospital to talk with Knight. The officer went through Knight's belongings that the hospital stored for Knight while he was being treated. The officer noticed that there was no money inside Knight's wallet, but the hospital collected over $4,000 in cash from Knight's shorts. The money had blood on it. Knight also had a key for the black Kia, a key for Lyman's Acura, and a key fob for Lyman's BMW. After discovering where Knight

3

lived and obtaining a search warrant, the police searched his home and found a box of Federal .22 caliber bullets.

Knight was charged with capital murder for killing Lyman while committing or attempting to commit a robbery. At trial, police officers testified regarding their investigation and observations in this case. In addition, forensic scientists testified regarding fingerprint analyses and DNA testing that were performed in this case, and the medical examiner testified regarding the cause of death. Further, several individuals who knew Lyman, Knight, or Taylor testified, and Lyman's neighbor testified regarding the morning in question. The trial court admitted a recording of the 911 call by Knight, footage from a responding officer's body camera, police investigation photos, and case forensic reports.

First, a friend and employee of Lyman testified that Lyman was a sports bookie and kept money under his mattress, on top of cabinets, and in his closet. Further, the friend explained that Lyman had a .22 caliber Derringer that he kept with him and had other weapons in the apartment. When discussing Lyman's apartment, the friend explained that she went there multiple times a week, that Lyman did not keep his apartment disorganized, that she had been there a few days before the incident, and that it was not in the state of disarray depicted in the crime scene photos because the cabinets were not open and because Lyman's mattress was fully on the bedframe. Another of Lyman's friends testified that Lyman was a bookie, kept money around for bets, kept money under his bed, and carried a weapon with him. The friend also explained that Knight and Lyman previously lived together; however, she also stated that Knight and Lyman currently did not get along and that it would be surprising if Lyman allowed Knight into his apartment.

4

Next, Taylor's ex-girlfriend testified that she and Taylor lived with Knight in November 2018 and that Knight worked for Taylor at a poker room. In her testimony, she explained that Taylor turned himself into federal custody in January 2019. She related that Taylor gave Knight access to his belongings, including his Kia, and asked Knight to handle his business while he was away. In addition, she stated that Knight never had any money but that he told her a few days before he was arrested that he was about to come into a lot of money from "a side hustle" and would buy her a car. However, she also stated that he said that he was a bad person and that the police would come after him. Moreover, she testified that he had two guns, that one of them was black and pink, and that he had ammunition for that weapon. When shown a picture of the black and pink Sig Sauer recovered from Lyman's apartment, she testified that the weapon belonged to Knight.

In addition, one of Knight's former girlfriends testified that she was friends with Lyman, that Lyman was a bookie, that Lyman was known to have a lot of money on him, and that Lyman gave Knight money multiple times to help him. She related that Knight struggled financially, did not have a steady income, never had large amounts of cash, and did not have enough money to support his family. Further, she described how Knight and she moved in with Lyman for a year, how Knight and Taylor discussed ways to take Lyman's money, and how Knight regularly told her that he was going to rob Lyman. Additionally, she testified that Knight heard Lyman say that he kept money under his mattress. Moreover, she related that Knight sent her a text message with a picture of the pink and black gun found at Lyman's home. During her cross-examination, she related that Lyman worried about getting robbed, that he incorrectly accused Knight of stealing from him previously, that she thought Lyman pulled a gun out when accusing Knight of stealing from him, and that Lyman always had a gun on him.

5

One of the crime scene specialists testified that the blood patterns and pooling found throughout the apartment indicated that someone was bleeding and walking throughout the apartment. Further, she explained that Lyman's Derringer could not expel casings because it was a revolver but that the black and pink semiautomatic would eject casings. Further, she related that the Derringer may have misfired and had two fired cartridge casings inside but that the weapon was near the pantry in the kitchen and not near where Lyman died. When describing the scene, she stated that there were no weapons near Lyman or the couch other than the black and pink Sig Sauer, which was covered in blood. Next, she related that the following factors indicated to her that someone had been searching for something throughout the apartment: the presence of blood throughout the apartment, the shoe impressions in pools of blood, the cabinets being open, the mattress being askew, and the jeans with the pockets turned out. During her cross-examination, she explained that blood near the pantry could have been consistent with a struggle and that Lyman could have gotten blood on his feet through an altercation. Further, she related that the blood swipe on the wall near Lyman's bedroom could be consistent with someone stabilizing himself while bleeding profusely.

One of the forensic scientists involved in this case testified that she found a latent fingerprint on the top part of the black and pink Sig Sauer and that the print came from Knight's left palm. Another forensic scientist testified that he analyzed fragments recovered from Lyman's body and that the fragments had some characteristics consistent with having been fired from the black and pink Sig Sauer; however, he related that he could not confirm that the fragments were fired from that gun because the fragments were too damaged to make a scientific determination and that he did not test whether the fragments could have been fired from the Derringer.

Regarding DNA testing performed in this case, another forensic scientist testified that testing was done on blood samples obtained from a wall, a sheet from Lyman's bed, the floor near the bathroom, the floor near the bar stools in the kitchen, the carpet from the living room, the light switch by the front door, the wall near the entrance to Lyman's bedroom, the handle from a cabinet, the magazine from the black and pink Sig Sauer, and some of the money collected from the scene. The forensic scientist explained that the results all excluded Lyman as a potential contributor to the DNA profiles, specified that the DNA came from a single male individual, included Knight as a potential contributor, and explained that the odds of obtaining the DNA profiles if Knight was the contributor were more than a septillion times greater than the probability of obtaining the profiles if the DNA came from an unrelated and unknown individual.

Concerning testing performed on the duffel bag, the forensic scientist related that testing showed that the profile is "a mixture of three individuals, at least one of which is male"; that "[t]he probability of this profile if the DNA came from . . . Knight and two unknown individuals is 123,000 times greater than the probability of this profile if the DNA came from three unrelated, unknown individuals"; that "Knight is a possible contributor to the profile"; that "[t]he probability of this profile if the DNA came from . . . Lyman and two unknown individuals is 29 times greater than the probability of this profile if the DNA came from three unrelated, unknown individuals"; and that "Lyman is a possible contributor to the profile." Regarding testing performed on the jeans with the pockets out, she testified that Lyman was an assumed contributor because the jeans belonged to him, that "[t]he DNA profile from this item is interpreted as a mixture of three individuals, at least two of which are male"; that "[t]he probability of this profile if the DNA came from John Lyman, Kenneth Knight, and one unknown individual is 117 septillion times greater than the probability of this profile if the

7

DNA came from John Lyman and two unrelated, unknown individuals"; and that "[t]his likelihood ratio indicates support for the proposition that Kenneth Knight is a possible contributor to the profile."

One of the detectives involved in this case testified regarding forensic efforts that were made to search the following five phones seized in the investigation: the iPhone found in Lyman's apartment that Knight used, Lyman's two Samsung phones, and Knight's two LG cell phones discovered in the Kia. The Detective explained that his investigation revealed that the iPhone belonged to Taylor. Further, the Detective explained that after Taylor surrendered to federal authorities in January 2019, someone used Taylor's phone to respond to two text messages in February 2019 before the incident and explain in those messages that Taylor was in prison.

Along those same lines, a crime analyst testified about reports detailing usage for the five cell phones. Regarding one of Knight's LG phones, the analyst related that the phone was used to send a picture of Knight with a firearm in the background to Knight's ex-girlfriend on January 13, 2019. Further, the analyst explained that she prepared a report of exchanges between one of Knight's LG phones and Taylor's iPhone from January 2019 before Taylor turned himself in and related that the following exchanges occurred:

> Taylor's iPhone January 8: U absolutely cannot let anyone see me and u talking [t]o report to Scott
>
> Knight's LG: No problem
>
> Taylor's iPhone January 22: Scotty was gone all day
>
> Knight's LG: Fuck our luck
>
> Knight's LG January 25: Mark do me a favor try talking to scotty for me tell him ive changed and could really help him save money with the tow trucks please try

The analyst then went over the report of text exchanges between Taylor's iPhone and one of Lyman's Samsung phones on the morning of the offense—February 18, 2019, nearly one month after Taylor turned himself in—and explained that the following exchanges occurred:

Taylor's iPhone 8:10 a.m.: Hey bud I'm sending you a suitcase I really need you to hold on to for me it has all my important papers in it I don't want anyone else holding it

Taylor's iPhone 8:12 a.m.: It's heavy Kenny said you were in pain with your legs I hope your ok

Lyman's Samsung 8:30 a.m.: Ok

Taylor's iPhone 9:19 a.m.: Dam Scotty I'm trying to talk to you and I want Kenny to show you a video I can only call [o]n approved numbers he has the phone so talk to me and watch the video fuck you can trust him bud

Lyman's Samsung 9:20 a.m.: You told me before he was trying to rob me now you said he's supposed to be my big buddy

Taylor's iPhone 9:22 a.m.: I didn't want you t[w]o talking then because I had to make sure I could trust him

Taylor's iPhone 9:22 a.m.: And I trust him with my life dam he has a power of attorney for me

Lyman's Samsung 9:23 a.m.: I just don't need him

Taylor's iPhone 9:25 a.m.: I'm sorry now that I said that he's been great I don't want you to need him I just thought he could if you needed it that all he's working and taking care of my business I just need to talk to you now

Taylor's iPhone 9:25 a.m.: And watch the video

Taylor's iPhone 9:26 a.m.: I told him not to ever come back to your place ok

Lyman's Samsung 9:26 a.m.: Ok

Taylor's iPhone 9:27 a.m.: And let him go to the [d]am bathroom lol he's pissing his pants

Another detective involved in the investigation testified that after home invasion burglaries and robberies, the homes will be in disarray and look as though someone was

9

searching through them for valuables. The detective also related that individuals who are involved in illegal activities can become targets for robberies because the way in which they make their money prevents them from using banks to deposit the money. When describing her observations of Lyman's apartment, the detective explained that the condition of the apartment looked as if a robbery or burglary had occurred because the home was in disarray, because the cabinets had been opened, and because Lyman's mattress had been moved out of the frame. Further, the detective testified that Lyman was found face down on the couch on his knees with his arms tucked under his body, that there was a black bag found near Lyman's body, and that Lyman's Derringer was on the opposite side of the apartment from where Lyman was found.

Finally, the medical examiner testified that there were four gunshots to Lyman's head. Further, the medical examiner related that the injury to the left side of Lyman's scalp was lethal, entered the skull, and injured his brain. In addition, she testified that she recovered bullet fragments from inside Lyman's skull and that the cause of death was gunshot wounds to the head. Moreover, she explained that Lyman had blunt force injuries to his hands that could have been caused during a struggle or by hitting furniture and that she could not say whether the shooter was behind Lyman when shooting him.

After considering the evidence presented at trial, the jury convicted Knight of capital murder.

## DISCUSSION

In his first issue on appeal, Knight contends that the trial court erred by refusing to grant a mistrial after the State elicited evidence concerning a prior robbery. In his second issue, Knight argues that the evidence presented at trial was insufficient to support his conviction

10

for capital murder. Because Knight's second issue could result "in greater relief than his other issue," we address that issue first. *See Medina v. State*, 565 S.W.3d 868, 873 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd).

**Sufficiency of the Evidence**

On appeal, Knight contends that the evidence was insufficient because it did not establish that he committed murder while committing a robbery. More specifically, Knight argues that the evidence did not establish "how much money Lyman had lying around on the day of this death" or establish that the money found on Knight belonged to Lyman. Further, Knight highlights that his fingerprints were found on the barrel of Lyman's gun indicating that Knight "was defending himself by trying to divert the muzzle of Lyman's gun away from himself." Along those same lines, Knight urges that if he had already pointed a gun at Lyman, "why would he not have simply shot Lyman rather than adopt the riskier and less effective expedient of grabbing Lyman's gun?" For these reasons, Knight contends that the evidence did not establish that he robbed or tried to rob Lyman or that he "was acting with the intent to commit murder rather than defending himself when attacked by Lyman," and Knight asks this Court to reverse his conviction and render a judgment of acquittal.

"Evidence is sufficient to support a criminal conviction if a rational jury could find each essential element of the offense beyond a reasonable doubt." *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In making this determination, "[w]e view the evidence in the light most favorable to the verdict and consider all of the admitted evidence, regardless of whether it was properly admitted." *Id.* "The jury is the sole judge of credibility and weight to be attached to the

11

testimony of the witnesses." *Id.* "Juries can draw reasonable inferences from the evidence so long as each inference is supported by the evidence produced at trial," *id.*, and are "free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence," *Eustis v. State*, 191 S.W.3d 879, 884 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt v. State*, 368 S.W.3d 516, 525-26 (Tex. Crim. App. 2012).

Appellate courts must "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007). Appellate courts also must bear in mind that "direct and circumstantial evidence are treated equally" and that "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of an actor" and "can be sufficient" on its own "to establish guilt." *Kiffe v. State*, 361 S.W.3d 104, 108 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). The evidence is legally insufficient if "the record contains no evidence, or merely a 'modicum' of evidence, probative of an element of the offense" or if "the evidence conclusively establishes a reasonable doubt." *Id.* at 107 (quoting *Jackson*, 443 U.S. at 320).

Under the Penal Code, a person commits the offense of capital murder "if the person commits murder" and "the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery." Tex. Penal Code § 19.03(a)(2). A person commits robbery if, "in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 29.02(a). Regarding the offense of theft, the Penal Code specifies that a person

12

commits that offense "if he unlawfully appropriates property with intent to deprive the owner of property" and that "[a]ppropriation of property is unlawful if . . . it is without the owner's effective consent." *Id.* § 31.03(a)-(b).

During the trial, witnesses testified that Lyman was a sports bookie, was known to keep large amounts of cash, and kept cash under his mattress and in other places throughout his home. *See Holland v. State*, 654 S.W.2d 745, 748 (Tex. App.—Houston [14th Dist.] 1983) (noting that evidence was sufficient to link defendant to burglary in part because evidence showed defendant knew victim "kept large sums of money on hand"), *aff'd*, 653 S.W.2d 820 (Tex. Crim. App. 1983). Moreover, evidence was presented establishing that Knight learned that Lyman kept money under his mattress, that Knight discussed robbing Lyman with Taylor before Lyman's death, that shortly before the incident Knight explained to Taylor's ex-girlfriend that he was about to receive a lot of money, and that he told her that the police would be coming after him and that he was a bad person. *See Herrin v. State*, 125 S.W.3d 436, 441 (Tex. Crim. App. 2002) (commenting that offense constitutes capital murder committed in course of robbery if intent to rob was "formulated before or at the time of the murder"); *Morris v. State*, 892 S.W.2d 205, 208 (Tex. App.—Texarkana 1994, no pet.) (determining that evidence was sufficient to support defendant's conviction for intentionally committing murder in course of robbery where, among other reasons, evidence showed that defendant discussed robbing store before crime took place). Further, text messages between Knight's and Taylor's phones weeks before the incident showed that someone using Taylor's phone warned that no one should see the two of them talking who could later report it to a man with Lyman's middle name, that the individuals using those phones expressed disappointment that the man had been gone all day,

13

and that someone using Knight's phone asked Taylor to tell the man that Knight had changed and could be helpful to the man.

In addition, the evidence established that Taylor turned himself into federal custody in January 2019 before the incident and that Taylor gave Knight access to his belongings. Moreover, the evidence established that Knight used Taylor's phone to call 911 from inside Lyman's apartment, that someone used Taylor's phone shortly before the incident to send text messages to Lyman's phone urging Lyman to let Knight into the apartment to use the restroom and suggesting that Knight could be helpful to Lyman, and that in the weeks leading up to the incident someone used Taylor's phone to respond to text messages and inform people that Taylor had gone to prison. On the morning of the offense, Lyman's neighbor observed a man carrying a black duffel bag approaching Lyman's apartment and asking the tenant if he could enter the apartment and use the restroom shortly before Lyman's death, and a black duffel bag containing items belonging to Taylor was found inside Lyman's apartment and near Lyman's body.

Further, Taylor's ex-girlfriend explained that the black and pink Sig Sauer found in Lyman's apartment belonged to Knight. *Cf. Kay v. State*, No. 01-95-00380-CR, 1996 WL 404034, at *5 (Tex. App.—Houston [1st Dist.] July 18, 1996, pet. ref'd) (op., not designated for publication) (emphasizing in sufficiency analysis for murder conviction evidence establishing that defendant owned weapon used to shoot victim). Additionally, although Knight contends that handprint analysis showed the presence of his palm print on Lyman's Derringer and urges that the print was placed there when Knight attempted to defend himself, the forensic scientist did not discuss prints discovered on Lyman's weapon and instead testified that Knight's palm print was found on the black and pink Sig Sauer identified as belonging to Knight.

Another forensic scientist testified that although he could not confirm that the bullet fragments recovered from Lyman's body were fired from the Sig Sauer, he also explained that the fragments had characteristics that were consistent with having been fired from that weapon. Regarding Lyman's Derringer, the crime scene specialist explained that the Derringer may have misfired and that there were two fired casings inside the revolver, but she and some police officers testified that the weapon was found on the opposite side of the apartment from where Lyman's body was found. Additionally, the crime scene specialist testified that the Derringer would not eject casings because it was a revolver, and the police found multiple discharged casings in the apartment.

Moreover, police officers explained that individuals like Lyman who are involved in gambling are often the target of robberies because those individuals typically cannot deposit money in a bank and that the state of Lyman's home appeared consistent with a robbery or burglary because the home was in disarray, because the mattress had been partially moved off the frame, because the pockets on jeans found near Lyman had been turned inside out, and because the cabinet doors were open. One of Lyman's friends testified that Lyman's home was not in disarray a few days before the incident and that Lyman did not keep his home disorganized. The evidence established that Knight was found in Lyman's apartment shortly after the incident; that the blood found throughout the apartment was consistent with someone bleeding while walking through the apartment; that the DNA profiles for blood samples taken from various spots throughout the apartment, including the mattress, a cabinet handle, and the Sig Sauer, were consistent with Knight's DNA profile but not Lyman's DNA profile; and that the DNA profiles from samples taken from the black duffel bag and the jeans near Lyman were consistent with mixtures of Knight's and Lyman's DNA. *Cf. King v. State*, 91 S.W.3d 375, 380

15

(Tex. App.—Texarkana 2002, pet. ref'd) (commenting in sufficiency analysis that DNA testing linked defendant "to the scene of the crime" and explaining that "[t]he jury was entitled to weigh the evidence presented . . . to determine if [defendant] was the offender").

Finally, although Knight's ex-girlfriend testified that Knight struggled financially and never had large amounts of cash, the treating personnel at the hospital found in his shorts over $4,000 in cash, keys to Lyman's Acura, and a key fob for Lyman's BMW, and the police found over $20,000 inside the glovebox of the Acura. *See Powell v. State*, 88 S.W.3d 794, 797-98 (Tex. App.—El Paso 2002, pet. struck) (concluding that evidence was sufficient to establish that victims were murdered in course of robbery where evidence established that, among other things, defendant knew victims, defendant was stopped by police with large amount of cash, defendant did not have that amount of money on prior day, victims were known to keep cash in house, and defendant had "blood and positive DNA on her shirt"); *see also Coy v. State*, No. 03-02-00753-CR, 2003 WL 22023423, at *3 (Tex. App.—Austin Aug. 29, 2003, no pet.) (mem. op., not designated for publication) (determining that evidence was sufficient to support aggravated robbery conviction and noting that defendant "had a large amount of cash stuffed into the pockets of his shorts").

From the evidence presented at trial, the jury was free to make the following and other reasonable inferences: that Knight planned to rob Lyman on the morning in question after undertaking steps to earn Lyman's trust and gain entry into Lyman's apartment, owned and brought the pink and black Sig Sauer, used the weapon to fatally shoot Lyman while Lyman's weapon was on the other side of the apartment, searched through Lyman's home for cash, and took cash from the home and a key and a key fob to Lyman's vehicles in the parking lot. Given our standard of review, we must conclude that the evidence is sufficient to support the jury's

16

determination that Knight killed Lyman while committing robbery and that, therefore, Knight committed capital murder. Accordingly, we overrule Knight's second issue on appeal.

**Mistrial**

In his first issue on appeal, Knight contends that the trial court erred by denying his motion for a mistrial after a friend of Lyman's testified regarding an extraneous offense. During her testimony, the friend explained that Lyman and Knight lived together approximately two years before Lyman's death. When the friend was asked about whether Lyman and Knight were still friends at the time of Lyman's death, the following exchange occurred:

> [State]: Near in time to when [Lyman] was killed, did you ever see . . . Knight hanging out with [Lyman]?
>
> . . .
>
> [Friend]: Absolutely not.
>
> [State]: And what do you mean when you say absolutely not? What do you mean?
>
> [Friend]: Well, he had already robbed him once.
>
> [State]: Well, let me – there was a suspicion about that, correct?
>
> [Friend]: I mean, [Lyman] told me that, and then immediately he moved out.

At that point, Knight objected on hearsay grounds, suggested that the State should not have questioned the witness in a manner that would lead to testimony regarding an extraneous offense, and requested that the trial court instruct the jury to disregard the testimony.[1]

---

[1] We note that Knight also generally asserted that the testimony violated "his constitutional rights" without identifying which constitutional provisions had allegedly been violated or providing an argument from which the trial court could have determined the basis for the constitutional objection. *See* Tex. R. App. P. 33.1 (setting out requirements for preserving

17

In response, the State explained that the witness did not have all the pertinent information regarding the prior offense and that it could clear up the misunderstanding with a subsequent witness who would explain that although Lyman initially thought Knight might have been involved in a prior robbery, Lyman later realized that Knight was not involved in the prior robbery. After considering the arguments by the parties, the trial court agreed to instruct the jury to disregard the witness's testimony about a prior incident and not to consider it for any purpose. Lyman then moved for a mistrial, and the trial court denied that motion.

On appeal, Knight contends that the trial court erred by denying his motion for mistrial because the State improperly put "before the jury an extraneous alleged robbery which was never proved up . . . in a case where proof of robbery is an essential element and for which there was remarkably little evidence." Further, Knight urges that "[t]he introduction of the alleged prior robbery greatly harmed [him] because it irretrievably planted in the minds of the jur[y] the notion that [he] was a robber" and that the trial court's instruction to disregard could not "possibly have cured the State's error" because "the bell simply could not be un-rung." Accordingly, Knight asks this Court to reverse his conviction and remand for a new trial.

"Appellate courts review a trial court's denial of a motion for mistrial under an abuse-of-discretion standard of review." *Browne v. State*, 483 S.W.3d 183, 203 (Tex. App.—Austin 2015, no pet.). Under that standard, a trial court's ruling will only be deemed an abuse of

---

complaint for appellate consideration); *Hernandez v. State*, No. 04-04-00020-CR, 2004 WL 1195833, at *1 (Tex. App.—San Antonio June 2, 2004, no pet.) (mem. op., not designated for publication) (explaining that defendant's general objection that action was "a violation of his constitutional rights" was "too general to constitute a proper objection under Rule 33.1"); *see also Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (explaining that need to inform trial court of basis for complaint is even greater when complaint is making constitutional argument); *Bunton v. State*, 136 S.W.3d 355, 368 (Tex. App.—Austin 2004, pet. ref'd) (commenting that hearsay objection does not preserve constitutional complaint).

18

discretion if it is so clearly wrong as to lie outside the zone of reasonable disagreement, *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002), or is arbitrary or unreasonable, *State v. Mechler*, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). Whether an improper reference to an extraneous offense warrants a mistrial depends on the particular facts of the case. *See Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). In most instances, an instruction to disregard will cure any error associated with an improper reference to an extraneous offense committed by the defendant. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000); *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998); *see also Young v. State*, 591 S.W.3d 579, 596 (Tex. App.—Austin 2019, pet. ref'd) (citing case for proposition that reviewing "court presumes that a trial court's instruction to disregard will be followed by the jury").

"There must be a showing of obvious harm despite the instruction to disregard before a mistrial is proper." *McIntosh v. State*, 855 S.W.2d 753, 770 (Tex. App.—Dallas 1993, pet. ref'd). A trial court must grant a mistrial only when an improper question or answer is "clearly prejudicial to the defendant and is of such character as to suggest the impossibility of withdrawing the impression produced on the minds of the jurors." *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000) (quoting *Ladd*, 3 S.W.3d at 567). In other words, a mistrial will only be required under extreme circumstances where the prejudice is incurable. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007); *see also Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (explaining that mistrial may be used as "remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile'" (quoting *Ladd*, 3 S.W.3d at 567)).

In this case, any error was cured by the trial court's instruction to disregard. The allegedly improper testimony was one brief pair of statements, and the trial court promptly

instructed the jury to disregard those statements. Nothing in the record before this Court suggests the jury was unable to follow the instruction. *See Gamboa v. State*, 296 S.W.3d 574, 581 (Tex. Crim. App. 2009). The statements were not so emotionally inflammatory or extreme that the rare remedy of a mistrial would be necessary to cure any prejudice. *See Archie v. State*, 340 S.W.3d 734, 739 (Tex. Crim. App. 2011) (explaining that mistrial is reserved for rare circumstances where objectionable action is so emotionally inflammatory that curative instruction is unlikely to prevent jury from being unfairly prejudiced against defendant). On the contrary, in this case Knight was charged with a violent murder, but the statements at issue addressed a robbery and did not provide any details concerning the alleged offense. *See Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Crim. App. 1990) (determining that improper reference to prior unauthorized use of motor vehicle did not warrant mistrial where crime charged was "extremely violent" capital murder in course of committing robbery); *see also Rojas*, 986 S.W.2d at 250 (determining that instruction to disregard cured any error where "defense counsel's timely objection . . . prevented [witness] from elaborating on the mentioned extraneous conduct").

Additionally, the State explained to the trial court that Lyman's friend was mistaken and that it would clear up the inaccurate statements through a subsequent witness. Consistent with those assertions, the State elicited testimony from a later witness establishing that although Lyman initially suspected that Knight was involved in a prior robbery, Lyman learned that Knight was not involved in the prior robbery and apologized for making an incorrect accusation. Further, although Knight contends that the instruction to disregard could not have cured any error because there was little evidence to establish that he robbed Lyman, we note as set out in the previous section of the opinion that the State presented a substantial amount of

20

evidence from which the jury could have reasonably determined that Knight killed Lyman while in the course of robbing him.

For these reasons, we conclude that the trial court did not abuse its discretion by denying Knight's motion for a mistrial and, therefore, overrule his first issue on appeal.

## CONCLUSION

Having overruled both of Knight's issues on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Chief Justice Byrne, Justices Baker and Smith

Affirmed

Filed:   December 30, 2022

Do Not Publish